**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

DECKER ADVERTISING INC.,

                    Plaintiff,

         v.

DELAWARE COUNTY, NEW YORK; and
TINA MOLÉ; ARTHUR MERRILL; MARK TUTHILL;
THOMAS AXTELL; JEFFREY TAGGART; WAYNE
E. MARSHFIELD; JERRY VERNOLD; JAMES E.
EISEL; GEORGE HAYNES, JR.; BETTY L. SCOTT;
JAMES G. ELLIS; CARL PARTRICK DAVIS; ALLEN
R. HINKLEY; ERIC T. WILSON; JOHN S. KOSIER;
WILLIAM LAYTON; JOSEPH CETTA; and AMY
MERKLEN, in their individual and official capacities,

                    Defendants.

Case No. 3:23-cv-1531 (AMN/ML)

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**</u>

Heather E. Murray
Mark H. Jackson
CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518
Email: hem58@cornell.edu
         mhj35@cornell.edu

Michael J. Grygiel
GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, NY 12207
Tel.: (518) 689-1400
Email: grygielm@gtlaw.com

*Counsel for Plaintiff Decker Advertising Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

LEGAL STANDARD.............................................................................................................. 6

ARGUMENT ........................................................................................................................... 6

I.    THE COMPLAINT PLAUSIBLY ALLEGES FIRST AMENDMENT
      RETALIATION ............................................................................................................ 6

      A.    The First Amendment Does Not Allow Defendants to De-Designate *The
            Reporter* as an Official County Newspaper Based on the Exercise of Its
            First Amendment Rights. ................................................................................... 6

            1.    Plaintiff Plausibly Alleges that Its Reporting is Protected Speech. ........... 8

      B.    Plaintiff Suffered an Adverse Action Because As an Independent
            Newspaper, *The Reporter* Is Categorically Eligible for Designation Under
            § 214(2) and Favored for Designation Because Of Its Wide Circulation. ............ 12

      C.    *The Reporter* plausibly pled a *prima facie* case that Defendants had a
            retaliatory motive. ............................................................................................. 16

      D.    *The Reporter* Has Standing to Challenge Defendants' Gag Directive. ............... 19

      E.    Defendants' Gag Directive Is An Unconstitutional Form of Prior Restraint........ 20

            1.    Defendants fail to meet their heavy burden of justifying their prior
                  restraint. ................................................................................................. 21

      F.    No Actual Chilling Effect Is Required to Plausibly Allege Independent
            Contractor Claims. ............................................................................................. 23

II.   *THE REPORTER* PLAUSIBLY PLED VIOLATIONS OF ITS RIGHTS UNDER
      THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH
      AMENDMENT...................................................................................................................... 24

III.  DEFENDANTS' MOUNT HEALTHY DEFENSE DOES NOT SUPPORT
      DISMISSAL OF PLAINTIFF'S FIRST CLAIM. .......................................................... 26

IV.   DEFENDANTS ARE NOT ENTITLED TO LEGISLATIVE IMMUNITY FOR
      THEIR DE-DESIGNATION OF *THE REPORTER*...................................................... 28

V.    *THE REPORTER*'S CLAIMS ARE NOT BARRED BY THE AVAILABILITY
      OF STATE ACTION UNDER ARTICLE 78. ............................................................... 30

CONCLUSION....................................................................................................................... 30

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                  **Pages**

*281 Care Comm. v. Arneson*,
    638 F.3d 621 (8th Cir. 2011) ...................................................................................11

*Almonte v. City of Long Beach*,
    478 F.3d 100 (2d Cir. 2007)...................................................................................29

*Application of Dow Jones & Co., Inc.*,
    842 F.2d 603 (2d Cir. 1988)...................................................................................19

*Application of Nat'l Broad. Co.*,
    828 F.2d 340 (6th Cir. 1987) ....................................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................6

*Bantam Books, Inc., v. Sullivan*,
    372 U.S. 58 (1963)..................................................................................................22

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan., v. Umbehr*,
    116 S. Ct. 2342 (1996)..............................................................................................6

*Buchanan v. City of New York*,
    556 F. Supp. 3d 346 (S.D.N.Y. 2021)....................................................................16

*Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*,
    411 F.3d 306 (2d Cir. 2005)...................................................................................12

*Cap. Cities Media, Inc. v. Chester*,
    797 F.2d 1164 (3d Cir. 1986)............................................................................24, 25

*Cioffiv. Averill Park Central School Dist*,
    444 F.3d 158 (2d Cir. 2006)...................................................................................18

*City of San Diego, Cal. v. Roe*,
    543 U.S. 77 (2004)....................................................................................................9

*Clark Cnty. Sch. Dist. v. Breeden*,
    532 U.S. 268 (2001)..........................................................................................16, 17

*El Dia, Inc. v. Governor Rossello*,
    165 F.3d 106 (1st Cir. 1999)..................................................................................1, 7

*Figueroa v. Garland*,
    No. 1:21-CV-7849-GHW, 2023 WL 4865831 (S.D.N.Y. July 31, 2023) ...............17

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)................................................................................................21

*Garrison v. Louisiana*,
    379 U.S. 64 (1964)............................................................................................10, 11

*Gill v. Pidlypchak*,
    389 F.3d 379 (2d Cir. 2004)................................................................................7, 23

*Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*,
   252 F.3d 545 (2d Cir. 2001)..................................................................................19

*Gravel v. United States*,
   408 U.S. 606 (1972)...........................................................................................29

*Greeley Publ'g Co. v. Hergert*,
   No. CIV.A. 05-CV-00980EW, 2006 WL 1581754 (D. Colo. June 6, 2006)............27

*Grennan v. Nassau Cnty.*,
   No. CIVA042158(DRH)(WDW), 2007 WL 952067 (E.D.N.Y. Mar. 29, 2007) ...................11

*Guan v. Mayorkas*,
   530 F. Supp. 3d 237 (E.D.N.Y. 2021) .................................................................23

*Harhay v. Town of Ellington Bd. of Educ.*,
   323 F.3d 206 (2d Cir. 2003)...........................................................................28, 29

*Harman v. City of New York*,
   140 F.3d 111 (2d Cir. 1998)............................................................................1, 20

*Heck v. Humphrey*,
   512 U.S. 477 (1994)...........................................................................................30

*Holmes v. Long Island R.R. Co.*,
   No. 96 CV 6196 (NG), 2001 WL 797951 (E.D.N.Y. June 4, 2001) .....................17

*Illiano v. Mineola Union Free Sch. Dist.*,
   585 F. Supp. 2d 341 (E.D.N.Y. 2008) .................................................................12

*Johnson v. Eggersdorf*,
   8 F. App'x 140 (2d Cir. 2001) ............................................................................26

*Kent v. Ohio House of Representatives Democratic Caucus*,
   33 F.4th 359 (6th Cir. 2022) ..............................................................................29

*L-7 Designs, Inc. v. Old Navy, LLC*,
   647 F.3d 419 (2d Cir. 2011)..................................................................................6

*Liverman v. City of St. Petersburg*,
   844 F.3d 400 (4th Cir. 2016) ..............................................................................22

*Lynch v. City of New York*,
   952 F.3d 67 (2d Cir. 2020).................................................................................1, 6

*Maloy v. Ballori-Lage*,
   744 F.3d 250 (1st Cir. 2014) ..............................................................................26

*McKenna v. Nassau Cnty.*,
   No. 223CV4286ARRST, 2023 WL 8455670 (E.D.N.Y. Dec. 6, 2023)............23, 25

*Morrison v. Johnson*,
   429 F.3d 48 (2d Cir. 2005)..................................................................................23

*N. Mississippi Commc'ns, Inc. v. Jones*,
   792 F.2d 1330 (5th Cir. 1986) ..............................................................................7

*Nagle v. Marron*,
  663 F.3d 100 (2d Cir. 2011) .................................................................................18

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ............................................................................................20

*New York Times Co. v. United States*,
  403 U.S. 713 (1971) ............................................................................................20

*New York Times v. Sullivan*,
  376 U.S. 254 (1964) .............................................................................10, 11, 28

*Ocala Star-Banner v. Damron*,
  401 U.S. 295 (1971) ...................................................................................10, 11

*Overbey v. Mayor of Baltimore*,
  930 F.3d 215 (4th Cir. 2019) ...............................................................................19

*Patsy v. Board of Regents of Fla.*,
  457 U.S. 496 (1982) ............................................................................................30

*Perry v. McDonald*,
  280 F.3d 159 (2d Cir. 2001) .................................................................................20

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ..............................................................................................6

*Press & J., Inc. v. Borough of Middletown*,
  358 F. Supp. 3d 411 (M.D. Pa. 2018) ................................................................7, 8

*Quad-City Cmty. News Serv., Inc. v. Jebens*,
  334 F. Supp. 8 (S.D. Iowa 1971) ...........................................................................1

*Relihan v. Brink*,
  285 A.D. 729 (3d Dep't 1955) .......................................................................13, 14

*Reuland v. Hynes*,
  460 F.3d 409 (2d Cir. 2006) ...................................................................................9

*Rev. Publications, Inc. v. Navarro*,
  No. 89-1187-CIV-KEHOE, 1991 WL 252962 (S.D. Fla. June 26, 1991) ...............7

*Rubeor v. Town of Wright*,
  191 F. Supp. 3d 198 (N.D.N.Y. 2016) .................................................................28

*Severin v. New York City Dep't of Educ.*,
  No. 119CV00775MKVRWL, 2021 WL 1226995 (S.D.N.Y. Mar. 31, 2021) ........26

*Sher v. Coughlin*,
  739 F.2d 77 (2d Cir. 1984) ..................................................................................26

*Specht v. City of New York*,
  15 F.4th 594 (2d Cir. 2021) ...................................................................................9

*Stajic v. City of New York*,
  214 F. Supp. 3d 230 (S.D.N.Y. 2016) ..................................................................17

*Thomas v. Eby,*
 481 F.3d 434 (6th Cir. 2007) ........................................................................................26

*United States v. Alvarez,*
 567 U.S. 709 (2012)..............................................................................................2, 9, 10

*United States v. Nat'l Treasury Emps. Union,*
 513 U.S. 454 (1995)....................................................................................................21, 22

*Vaher v. Town of Orangetown, N.Y.,* 916 F. Supp. 2d 404 (S.D.N.Y. 2013) ..............................24

*Watison v. Carter,*
 668 F.3d 1108 (9th Cir. 2012) .......................................................................................1, 16

*Willowbrook v. Olech,*
 528 U.S. 562 (2000)......................................................................................................24

*Zdziebloski v. Town of E. Greenbush, N.Y.,*
 336 F. Supp. 2d 194 (N.D.N.Y. 2004)..........................................................................28

## State Cases

*People ex rel. Bonheur v. Christ,*
 208 N.Y. 6 (1916) ...................................................................................................13, 14

*Burns v. Joyce,*
 228 N.Y.S.2d 532 (Sup. Ct., Albany Cnty. 1962) ....................................................13, 14

*People ex rel. Mayham v. Dickson,*
 123 N.Y.S. 110 (3d Dep't 1910)................................................................................14, 15

*Myers-Brooks Pub. Co. v. Bd. of Sup'rs of Fulton Cnty.,*
 68 Misc. 2d 1033 (Sup. Ct., Fulton Cnty. 1972)..........................................................30

*News-Rev. Pub. Corp. v. Lomenzo,*
 53 Misc. 2d 370 (Sup. Ct., Suffolk Cnty.), *aff'd,* 28 A.D.2d 823, 282 N.Y.S.2d
 670 (1967)...................................................................................................................30

*People ex rel. Guernsey,*
 130 N.Y.S. 761 (Sup. Ct., Oneida Cnty. 1911) .........................................................13, 14

*Republican & Journal Co.,*
 119 N.Y.S. 387 (3d Dep't 1909).................................................................................13

*State Farm Mut. Auto. Ins. Co. v. Fitzgerald,*
 25 N.Y.3d 799 (2015) ................................................................................................13

*Utica Sunday Tribune v. Hugo,*
 158 N.Y.S. 490 (1916)...............................................................................................13

## State Statutes

N.Y. County Law, ch. 11 § 20 ...........................................................................................12

N.Y. County Law § 214.................................................................................2, 5, 12, 13, 14, 15, 28

1973 N.Y. Sess. L., c. 967 ................................................................................................13

**Rules**

N.Y. C.P.L.R. § 7801........................................................................................................30

**Other Authorities**

*The First Amendment and the Dissemination of Socially Worthless Untruths,* 36
   Fla. St. U. L. Rev. 1 (2008)........................................................................................11

Op. N.Y.S. Comp.,
   1994 No. 94-9, 1994 WL 645539, at *1 (Aug. 2, 1994).............................................13

*Robert Abrams*,
   1980 N.Y. Op. Att'y Gen. (Inf.) 169 (Jun. 10, 1980)................................................13

## PRELIMINARY STATEMENT

Plaintiff Decker Advertising Inc. ("*The Reporter*" or "Plaintiff") alleges in its Complaint that County officials withdrew legal notice advertising from *The Reporter* due to its critical news coverage and issued a gag order after the County's retaliatory tactics became national news. These allegations, taken as true, unquestionably "raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020); *see* Compl. Ex. O (featuring the controversy leading to this lawsuit in a *Times* article titled *How Local Officials Seek Revenge on Hometown Newspaper*). Time and again, courts have found that these actions amount to First Amendment retaliation because government officials cannot "[u]se government funds to punish political speech by members of the press and to attempt to coerce" favorable commentary. *El Dia, Inc. v. Governor Rossello*, 165 F.3d 106, 109-10 (1st Cir. 1999) (collecting cases). Nor can they issue a blanket prohibition on employees speaking to a news outlet about matters of public concern without running afoul of the presumption against prior restraints on speech and violating the constitutional guarantee of equal access to news sources on equal terms and conditions, without disfavored treatment and exclusion. *See Harman v. City of New York*, 140 F.3d 111, 115, 119 (2d Cir. 1998); *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 15 (S.D. Iowa 1971) ("Defendants' denial of access by Quad-City to records available to the other media presents an obvious case of denial of equal protection of the law in violation of the Fourteenth Amendment[.]").

Defendants' motion for judgment on the pleadings fails first and foremost because the claims are unequivocally adequately alleged. While "direct evidence of retaliatory intent rarely can be pleaded in a complaint[,]" *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012), this is the rare case where Defendants have made their retaliatory motive unmistakably clear in their own statements attached to and quoted in the Complaint. The motion also fails for several additional

reasons. *First*, Defendants' motion relies heavily on a proposition that the U.S. Supreme Court has repeatedly rejected, and that, if accepted, would make the government the arbiter of truth: "that false statements receive no First Amendment protection." *United States v. Alvarez*, 567 U.S. 709, 718 (2012). *Second*, Defendants' argument that *The Reporter*'s independence makes it ineligible for designation under County Law § 214(2) mistakenly hearkens back to a time before the 1973 amendments to the statute when independent journalism was the exception and not the norm. And by ignoring the statute's emphasis on newspapers with wide circulation while relying on other improper bases to support de-designation, Defendants undercut a prime purpose of public notices — *i.e.*, to inform constituents. *Third*, the gag directive is an impermissible prior restraint on speech, which cuts off access to news sources and singles *The Reporter* out among media outlets for disfavored treatment. *Fourth*, neither legislative immunity nor a *Mt. Healthy* defense prevail here, where immunity does not apply to the purely administrative actions alleged and the *Mt. Healthy* defense is premature. *Fifth*, Plaintiff is not required to exhaust administrative remedies before pursuing constitutional violation claims under Section 1983. The Court should thus deny the motion in its entirety.

## STATEMENT OF FACTS

Virtually since its founding in 1881, *The Reporter* had been designated by the Delaware County Board of Supervisors as an official county paper pursuant to County Law § 214(2). *See* Compl. ¶ 32. On March 23, 2022, the Board voted to de-designate *The Reporter* and designate in its place *The Hancock Herald*, exactly two weeks after the publication of an article titled *Delhi Justice Removed From Criminal Cases*. *See* Compl. ¶¶ 32, 34, *id.* Ex. A. Six days prior to the de-designation, the County sent a letter to *The Reporter* requesting a correction. *See id.* Ex. B. In addition to the request for a correction, which ran on the same day, the letter alleged *The Reporter* had a history of publishing "stories about Delaware County which are selectively researched, one-

sided, and . . . often uses sensationalism and exaggeration" that "undermin[e] [readers'] confidence in our County government by disparaging its actions and casting its leaders in a materially false light." *Id.* Ex. B, C.

The County claimed in its March 2022 resolution de-designating *The Reporter* that the decision was due to the fact that "the cost of placing a legal notice in The Reporter has doubled since the beginning of 2022, along with the amount of time it takes to successfully place the notices . . . ." *Id.* Ex. D. Several weeks prior to the de-designation, *The Reporter* had switched over to a statewide automated system for placing legal notices, during which it had learned that it had been undercharging for notices for decades, and corrected its rates to reflect the standard rates on the portal. *See id.* ¶ 45. A day after the de-designation, Defendant Tina Molé stated in an e-mail to *The Reporter*'s co-owner that the reasons behind the de-designation were those in the resolution and also because of the Editor "Lillian." *Id.* Ex. E.

On January 4, 2023, the Board of Supervisors voted again to designate *The Hancock Herald* and not *The Reporter* an official newspaper. *See id.* ¶ 49. *The Hancock Herald's* publisher in June 2023 acknowledged that the paper had lower circulation than *The Reporter* and that its legal notices were not published online at the time of the switch. *See id.* ¶ 51.

On March 8, 2023, the County sent a letter to *The Reporter's* publishers demanding that the newspaper make immediate changes to its coverage of County news. *See id.* Ex. G. In the letter, the County admitted that one reason for *The Reporter*'s de-designation was the paper's purported "flagrant manipulation of facts." *Id.* Two County officials in contemporaneous conversations with *The Reporter* pointed to a series of four articles on a County drone program as well as to other articles, all of which were published after the de-designation. *See id.* Exs. I–N.

On June 18, 2023, *The New York Times* published an article titled *How Local Officials Seek Revenge on Their Hometown Newspaper*. *See id.* Ex. O. It covered the County's de-designation of *The Reporter*, and quoted Defendant Wayne Marshfield, who "signed the letter, but said he had done so only to support his colleagues." On June 22, 2023, *The Reporter*'s Editor contacted County Public Defender Joseph Ermeti to confirm "who authorizes, creates and does the posting on the Delaware County Public Defender Facebook account." *Id.* ¶ 77.

On June 23, 2023, Mr. Ermeti responded to *The Reporter* that he had "been directed to refer all inquiries in this matter and any other matter that pertains to the Public Defender's office to the County Attorney's office." *Id.* ¶ 78.

When *The Reporter*'s Editor followed up with Defendant County Attorney Amy Merklen, she stated that "[s]ince the Reporter is represented by counsel and is contemplating litigation against the County, any and all communication should go through your attorney . . . my office represents the County and as such, the Reporter's attorney can reach out to me." *Id.* Ex. P.

On June 28, 2023, the County Board of Supervisors briefly met and discussed the Delaware County Democratic Committee's proposed resolution to re-designate *The Reporter*. *See id.* ¶ 89. The Board gave privilege of the floor to *The Hancock Herald*'s publisher to speak at length in apparent response to the content of the proposed resolution. *Id.* When Supervisor Wayland Gladstone noted that the resolution needed to go through the proper process, Ms. Molé confirmed that the resolution had been forwarded to the legislative committee. *See id.* ¶ 90.

During a phone call with Ms. Merklen on June 28, 2023, counsel for *The Reporter* requested that the directive be rescinded. *See id.* ¶ 80. On July 5, 2023, counsel for *The Reporter* sent an email to Ms. Merklen to schedule a follow-up conversation about the gag directive, to which she did not respond. *See id.* ¶ 81.

Subsequently, Mr. Ermeti responded to *The Reporter*'s Editor regarding another request for comment, but only after he told her that he was going to run the request for comment by Ms. Molé. *See id.* ¶ 82.  It remains unclear how many employees were directed not to speak to *The Reporter*'s journalists and whether the directive continues to be enforced. *See id.* ¶ 83.

On August 22, 2023, *The Reporter* sent a demand letter to the County requesting immediate reinstatement and compensation for the lost revenue resulting from its unlawful de-designation. *See id.* ¶ 97. *The Reporter* stated in the letter that both the de-designation and the gag directive violated its First Amendment rights and notified the County that it intended to file suit if the matter was not satisfactorily resolved. *See id.* ¶ 98.

The proposed resolution to designate *The Reporter* was discussed during a Legislative Committee Special Meeting on August 23, 2023, but no formal vote was taken. *See id.* ¶ 91. During the meeting, the Democratic Committee Chair Ms. Hayek expressed concern that placing public notices with *The Hancock Herald* was "not serving the people" because the paper is not widely read by citizens of the County. *See id.* ¶ 92. She requested that *The Reporter* be designated as an additional official county paper, and that the proposed resolution be placed on the Board's agenda for discussion and a vote. *See id.* ¶ 93. On October 11, 2023, the Democratic Committee informed the Board that it had voted to recommend *The Reporter* as its newspaper of record for 2024. *See id.* ¶ 94.

The counsel for the County sent a letter dated October 12, 2023, in response to *The Reporter*'s August 22, 2023, demand letter. *See id.* ¶ 99. The County rejected the demands set out in *The Reporter's* letter and argued that First Amendment precedent and County Law § 214 support the County's de-designation of *The Reporter*. At the time of the Complaint, *The Reporter* estimated

that it has lost over $12,000 in revenue, *see id.* ¶ 100, and also sought reinstatement, punitive damages, attorney's fees, and that the gag directive be rescinded.

## LEGAL STANDARD

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to . . . a Rule 12(b)(6) motion for failure to state a claim." *Lynch*, 952 F.3d at 74–75. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief . . . calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch*, 952 F.3d at 75 (internal quotation marks omitted). In making this assessment, the court must "draw all reasonable inferences in [the plaintiff's] favor." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).

## ARGUMENT

### I.    THE COMPLAINT PLAUSIBLY ALLEGES FIRST AMENDMENT RETALIATION

#### A.    The First Amendment Does Not Allow Defendants to De-Designate *The Reporter* as an Official County Newspaper Based on the Exercise of Its First Amendment Rights.

The U.S. Supreme Court declared over 50 years ago in *Perry v. Sindermann* that a governmental entity "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." 408 U.S. 593, 597 (1972). This doctrine applies even where, as here, a newspaper had no "right" to the government benefit generally and it could have been denied otherwise for any number of legitimate reasons. *Id.*; *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan., v. Umbehr*, 116 S. Ct. 2342, 2352

(1996) ("recogniz[ing] the right of independent government contractors not to be terminated for exercising their First Amendment rights").

Courts have repeatedly found that it is "clearly" unconstitutional for government officials to withdraw government advertising from newspapers in response to critical coverage—and for good reason. *El Dia, Inc.*, 165 F.3d at 109-10 ("It would seem obvious that using government funds to punish political speech by members of the press and to attempt to coerce commentary favorable to the government would run afoul of the First Amendment."). Permitting the government "to withhold public patronage, in the form of its advertising," in response to a newspaper's reporting "would allow the government to produce a result which [it] could not command directly, that is, denying the [newspaper] business in retaliation for its protected speech." *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1337 (5th Cir. 1986) (internal quotation marks omitted); *see also Rev. Publications, Inc. v. Navarro*, No. 89-1187-CIV-KEHOE, 1991 WL 252962, at *1, 9 (S.D. Fla. June 26, 1991) (awarding newspaper over $220,000 in attorney's fees in addition to award of $22,710 in compensatory damages after sheriff terminated legal notice advertising in retaliation for editorial coverage).

To claim retaliation, *The Reporter* need only allege that (1) the speech at issue concerned matters of public concern; (2) adverse action on the part of Defendants; and (3) that the speech was "a substantial or motivating factor" of the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 382 (2d Cir. 2004). The Complaint amply alleges retaliatory animus by Defendants triggered by reporting on matters of public concern, with the adverse actions by County officials closely tracking facts in an analogous Section 1983 case, where the Middle District of Pennsylvania recently denied the government's motion to dismiss. *See Press & J., Inc. v. Borough of Middletown*, 358 F. Supp. 3d 411, 418 (M.D. Pa. 2018).

Government officials in that case sent a letter to the paper explaining that they ended their advertising relationship due to coverage involving allegedly "distasteful sensationalism, misrepresentation of information and statements, unfounded speculation, questionable sourcing and observable bias[.]" *Id*. at 414. The letter went on to encourage the paper to "demonstrate reliability to professionally and responsibly report on" the government in order to receive patronage again. *Id*. Likewise here, the County Attorney sent a demand letter a week prior to the Board of Supervisors de-designating *The Reporter* as an official paper claiming that *The Reporter*'s Editor "has a history of writing stories about Delaware County which are selectively researched, one-sided and ignore or minimize any facts incompatible with her intended narrative" and "often uses sensationalism and exaggeration to play on the emotions, prejudices, and fears of her readers, undermining their confidence in our County government by disparaging its actions and casting its leaders in a materially false light." Compl. ¶ 36, *id*. Ex. B.  The day after the County de-designated *The Reporter*, the Chair of the Board of Supervisors stated in an email to *The Reporter*'s co-owner that the newspaper's Editor was one of the reasons why the County de-designated the newspaper.  *See id*. ¶ 43; *id*. Ex. E. And a year later, 39 County officials, including all Supervisor Defendants except James E. Eisel, Sr. (who had left office by that time) and Betty L. Scott, sent a letter openly admitting that an alleged "flagrant manipulation of facts and the manner in which [the] paper reports county business was one of the reasons the Board of Supervisors opted to change the official county paper to the Hancock Herald in 2022." *Id*. ¶ 60; *id*. Ex. G. County officials additionally claimed that the de-designation should have "prompted an immediate change" in *The Reporter*'s coverage of the County. *Id*. ¶ 61; *id*. Ex. G.

        1.      Plaintiff Plausibly Alleges that Its Reporting is Protected Speech.

The question of "[w]hether speech is on a matter of public concern presents a question of law that takes into consideration the content, form and context of a given statement," and whether

"it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public." *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021). The U.S. Supreme Court has further clarified that the standard for determining public concern in this context is simply "something that is a subject of legitimate news interest . . . at the time of publication." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83–84 (2004).

No credible argument can be made that *The Reporter*'s article covering the removal of a judge from his criminal court duties after a local attorney filed a complaint against him, *see* Compl. Exs. A-B, does not involve a matter of public concern. *See, e.g., Specht*, 15 F.4th at 601 ("To begin with, possible governmental misconduct is a legitimate and an important topic of public concern."). Indeed, it "strengthens the judicial process" to keep the public informed about the resolution of any issue in which a judge's "impartiality is questioned[.]" *Application of Nat'l Broad. Co.*, 828 F.2d 340, 345 (6th Cir. 1987). And "[c]ertainly crime is a 'matter of political, social, or other concern to the community,'" *Reuland v. Hynes*, 460 F.3d 409, 418 (2d Cir. 2006), with robust coverage of crime necessarily including reporting on the functioning of the criminal justice system. Nor do Defendants even attempt to argue that other coverage of County affairs by *The Reporter* referenced in two County letters attached to the Complaint and in contemporaneous conversations with officials fail to qualify as matters of public concern. *See, e.g.,* Compl. ¶¶ 36, 57-58, 60, 65-72; Exs. B, G, I-N.

Instead, Defendants' argument that *The Reporter*'s speech is unprotected hinges on a single error that the paper promptly corrected upon request, coupled with a sweeping proposition that the U.S. Supreme Court has "never endorsed" and, indeed, has outright rejected, most recently in *United States v. Alvarez*: "that false statements receive no First Amendment protection." 567 U.S. 709, 719 (2012). *See* Def.'s Mot. at 9 ("Incorrect information published by a news outlet is not due

any protection under the First Amendment.") (citing *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 301 (1971)). This proposition reverses the basic presumption of the First Amendment that most speech, even utterances that are proven to be demonstrably false, is presumptively protected unless the government can clear high constitutional hurdles to prove otherwise. *See, e.g.*, *New York Times v. Sullivan*, 376 U.S. 254, 283-84 (1964).

The U.S. Supreme Court made clear in *New York Times v. Sullivan* that false statements, standing alone, are protected by the First Amendment. *Id*. In that case, it was undisputed that defendants had published false factual statements. 376 U.S. at 258-59. But the Court observed that it has consistently "refused to recognize an exception for any test of truth" because "erroneous statement is inevitable in free debate[,]" which "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive[.]'" *Id*. at 271-72 (internal citations omitted).

Defendants cite to an "isolated statement[]" in a decision that extended the *New York Times v. Sullivan* principle "to support its contention that false statements have no value and hence no First Amendment protection," but, just as in *Alvarez*, Defendants' interpretation "take[s] the quoted language far from its proper context." *Alvarez*, 567 U.S. at 718; *see* Def.'s Mot. at 10 ("[m]isinformation has no merit in itself; standing alone it is as antithetical to the purposes of the First Amendment as the calculated lie.") (citing *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 301 (1971); *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964)). *Ocala Star-Banner v. Damron* in fact stands for the proposition that a newspaper's mistake in stating that a candidate for office had been charged with perjury, standing alone, does not suffice to bring the speech outside the First Amendment unless it was a knowing or reckless falsehood. *See Ocala Star-Banner*, 401 U.S. 295, 300 (1971). Defendants quote from Justice White's concurrence, which merely clarifies that "[t]he

sole basis for protecting publishers who spread false information is that otherwise the truth would too often be suppressed." *Id*. at 301; *see also Garrison*, 379 U.S. at 73 ("[E]ven where the utterance is false, the great principles of the Constitution which secure freedom of expression . . . preclude attaching adverse consequences to any except the knowing or reckless falsehood."). Indeed, there would be little left of press freedom if the government could lawfully penalize a newspaper based on coverage it disliked. Allowing the government to be the arbiter of truth "raises special First Amendment concerns" regarding "constraining the collective authority of temporary political majorities to exercise their power by determining for everyone what is true and false, as well as what is right and wrong." *281 Care Comm. v. Arneson*, 638 F.3d 621, 636 (8th Cir. 2011) (quoting Stephen G. Gey, *The First Amendment and the Dissemination of Socially Worthless Untruths,* 36 Fla. St. U. L. Rev. 1, 3 (2008)).

Defendants additionally argue that the matter of *The Reporter*'s de-designation is a personal business concern and not a matter of public concern. Even if it could somehow be argued that all of *The Reporter*'s speech at issue relates to the de-designation itself (and allegations concerning several news articles entirely unrelated to the de-designation demonstrate this is not the case), "[t]he requirement is not that the plaintiff have absolutely no personal interest; rather, that personal interest may not be the overriding one[,]" with "the key inquiry" being "whether the statements were made by plaintiff in her role as a disgruntled employee or her role as a concerned citizen." *Grennan v. Nassau Cnty.*, No. CIVA042158(DRH)(WDW), 2007 WL 952067, at *8 (E.D.N.Y. Mar. 29, 2007). The Complaint demonstrates that *The Reporter*'s Co-owners spoke about the de-designation to a *New York Times* reporter, who covered the County's de-designation in a story titled *How Local Officials Seek Revenge on Their Hometown Newspapers*. *See* Compl. ¶¶ 74-76. The County then put the gag directive concerning *The Reporter* in place mere days after

the County's de-designation became national news. Case law cited by Defendants recognizes that speech is more likely to be considered merely unprotected airing of "personal grievances" if it is in a private email as opposed to a "letter to the editor," for example, "complaining about the alleged unlawful conduct." *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 354 (E.D.N.Y. 2008). Here, the County's own actions further demonstrates that this is an issue of public concern by, on information and belief, leaking officials' letter concerning the de-designation and *The Reporter*'s coverage to *The Mountain Eagle*, which ran the letter in full on its front page. Compl. ¶¶ 62-63. In any event, "[p]ublic accusations of improper governmental actions are clearly matters of public concern, regardless of whether the accuser is motivated by personal reasons." *Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 313 (2d Cir. 2005).

Because reporting on matters of public concern, including improper governmental actions, is quintessentially protected speech, even if it contains errors that were not knowingly false or made with reckless disregard for the truth, Plaintiff has plausibly pled that its reporting is protected speech.

**B.    Plaintiff Suffered an Adverse Action Because As an Independent Newspaper, *The Reporter* Is Categorically Eligible for Designation Under § 214(2) and Favored for Designation Because Of Its Wide Circulation.**

Defendants argue that Plaintiff does not plausibly plead an adverse action because the County's de-designation of *The Reporter* was purportedly required to comply with County Law § 214. *See* Def.'s Mot. at 14-15. Under County Law § 214(2), each county's board of supervisors "shall designate at least two newspapers published within the county as official newspapers for the publication of all local laws, notices and other matters required by law to be published." N.Y. County Law § 214(2). While in a bygone era the predecessor to § 214(2) contemplated the publication of these notices in politically aligned publications, the Legislature amended the provision over 50 years ago to expressly extend the designation to independent outlets. *See* N.Y.

County Law, ch. 11, § 20 (amended 1973). Today, in selecting which newspapers to designate, § 214(2) disclaims on its face that "a newspaper [that] is an independent newspaper not advocating the principles of any political party shall not disqualify it from consideration" and only suggests that counties give "consideration" to newspapers' political alignment, a clarification added to the statute by amendment in 1973.[1] N.Y. County Law § 214(2); 1973 N.Y. Sess. Law, c. 967, § 1.

In arguing against *The Reporter*'s eligibility for designation because it purportedly does not support the principles of the Republican party, the County relies wholly on cases that pre-date the 1973 amendment to County Law § 214(2). *See Burns v. Joyce*, 228 N.Y.S.2d 532 (Sup. Ct., Albany Cnty. 1962) (11 years prior); *Relihan v. Brink*, 285 A.D. 729 (3d Dep't 1955) (18 years prior); *People ex rel. Bonheur v. Christ*, 208 N.Y. 6 (1916) (57 years prior); *Utica Sunday Tribune v. Hugo*, 158 N.Y.S. 490 (1916) (same); *People ex rel. Guernsey*, 130 N.Y.S. 761 (Sup. Ct., Oneida Cnty. 1911) (62 years prior); *People ex rel. Republican & Journal Co.*, 119 N.Y.S. 387 (3d Dep't 1909) (64 years prior). But because the Legislature exercised its "competency to correct" matters of statutory interpretation by amending County Law § 214(2), the pre-1973 case law relied on by Defendants here to de-designate an independent newspaper is inapplicable. *State Farm Mut. Auto. Ins. Co. v. Fitzgerald*, 25 N.Y.3d 799, 820 (2015).

Even if the cases cited by the County on political partisanship were not legislatively overruled, all of them are factually inapposite here. In *Burns*, the Court enjoined a newspaper's designation as Albany County's Republican-designated paper because it "advocated the principles of the Democratic Party," going so far as to "call[] for the removal of the leadership of the

---

[1] Guidance provided on § 214(2) by state authorities after 1973 underscores the amendment's purpose in accommodating independent newspapers. *See* Robert Abrams, 1980 N.Y. Op. Att'y Gen. (Inf.) 169 (Jun. 10, 1980) ("[A] 1973 amendment provides that an independent newspaper not advocating the principles of any political party is not disqualified from being considered for designation"); Op. N.Y.S. Comp., 1994 No. 94-9, 1994 WL 645539, at *1 (Aug. 2, 1994) (enumerating list of requirements under § 214(2) with no mention of political affiliation).

13

Republican Party in Albany County[.]" 228 N.Y.S.2d at 533–34. The Court in *Relihan*, meanwhile, held that a newspaper may only be found ineligible for designation as a matter of law when it "does not bring itself *at all* within the standards of the statute," not only because it fails to advocate the principles of its designating party. 285 A.D. at 730–31 (emphasis added). Here, *The Reporter* continues to meet the accommodating standard for independent newspapers set by § 214(2). Finally, the Courts in *Bonheur* and *Guernsey* both rested their judgments on language that has long since been eliminated from § 214(2) requiring counties to designate, as identified by each political party, "a paper fairly representing the political party to which they respectively belong." *See* 208 N.Y. at 9; 130 N.Y.S. at 764. The 1973 amendment to the statute significantly modified this standard by deliberately accommodating independent newspapers that do "not advocat[e] the principles of any political party," and the modern statute merely suggests that partisan affiliation "may" receive "consideration." N.Y. County Law § 214(2).

The County's argument also ignores that in designating newspapers, it is required under the statute to consider "their general circulation *throughout* the county." N.Y. County Law § 214(2) (emphasis added); *see also People ex rel. Mayham v. Dickson*, 123 N.Y.S. 110, 111 (3d Dep't 1910). The relative circulation of newspapers competing for a county's designation is a significant factor considered by courts on review of a county's selection because "[t]he object of the statute is to give information of the laws enacted as generally as may be to the voters of the county[.]" *Dickson*, 123 N.Y.S. at 111; *see also Relihan*, 285 A.D. at 731 ("For the *Gazette* it can be shown that the *Courier* is a smaller paper and probably in influence by the proportion 33 to 9 than the *Gazette*"). The Complaint alleges that Delaware County only has two remaining local papers with county-wide reach: *The Reporter* and *The Mountain Eagle*. *See* Compl. ¶ 85. *The Reporter* is thus precisely the type of publication that should receive designation under § 214(2).

Because the County's choice to replace *The Reporter* has a smaller circulation and "leaves a large sweep of the county drastically underserved," § 214(2) affirmatively favors *The Reporter*'s designation instead.  *See* N.Y. County Law § 214(2); *Dickson*, 123 N.Y.S. at 111.

As an "independent newspaper[,]" *The Reporter* is precisely the kind of publication promoted by the 1973 amendment to County Law § 214(2).  *Id*.  *The Reporter* does "not advocat[e] the principles of any political party[,]" and the County is accordingly proscribed by § 214(2) from treating it as *per se* ineligible for designation based solely on its non-partisanship.  *See id*.  While the County may "consider" a newspaper's affirmative partisan affiliation, § 214(2) forbids it from categorically treating independent newspapers like *The Reporter* as ineligible based on their nonpartisanship.  *See id*. The County selectively quotes the vestiges of partisanship remaining in § 214(2) in its motion, but in doing so, improperly ignores the sentence concerning independent newspapers' eligibility that follows. Def.'s Mot. at 14-18; *id*. A complete reading of § 214(2) leaves no uncertainty of *The Reporter*'s continued eligibility for designation.[2]

Thus, the parties have identified no authority that supports *The Reporter*'s ineligibility under County Law § 214(2). To the contrary, the statute's emphasis on newspapers with broader circulation and New York courts' routinely favorable treatment of such papers makes clear that County Law § 214(2) not only provides for *The Reporter*'s eligibility, but favors it for designation over other Delaware County newspapers.

---

[2] Defendants rely on allegations outside the Complaint, including their novel recent designation of *The Reporter* under § 214(1) in 2024 as "a political paper" as evidence that somehow supports that their prior and continued de-designation of *The Reporter* is not an adverse action. *See* Def.'s Mot. at 17-18. But Defendants have not even demonstrated that these allegations should be properly considered at this stage, let alone shown that they in fact support Defendants' argument, considering the timing and novel manner in which this new alternate designation was undertaken. The Court should thus decline to consider these allegations at this time.

**C.    *The Reporter* plausibly pled a *prima facie* case that Defendants had a retaliatory motive.**

Defendants argue that Plaintiff failed to plausibly plead that Plaintiff's protected reporting was a substantial or motivating factor in Defendants' decision to de-designate *The Reporter*. *See* Def.'s Mot. at 18-19. But Defendants cannot explain away or ignore that this is the rare case where direct evidence of retaliatory animus is amply alleged in addition to circumstantial evidence. *See Watison*, 668 F.3d at 1114 ("[D]irect evidence of retaliatory intent rarely can be pleaded in a complaint[.]"). Defendants admit in writing that "the manner in which [*The Reporter*] . . . reports county business was one of the reasons the Board of Supervisors opted to change the official county paper to the Hancock Herald in 2022." Compl. Ex. G. This direct evidence of retaliatory animus followed a prior statement by the chair of the Board of Supervisors only a day after the de-designation that *The Reporter*'s Editor was one of the reasons for the change. *See id.* Ex. E. Moreover, the temporal proximity between *The Reporter*'s protected speech and Defendants' de-designation of *The Reporter* likewise plausibly supports a retaliatory motive.

First, Defendants argue that their 2023 letter in which they admit their retaliatory motive for the de-designation does not qualify as evidence of retaliation because it was sent too long after the de-designation. *See* Def.'s Mot. at 18-19. But Defendants misstate the law by asserting that temporal proximity between a single "expression of unconstitutional motivation and an adverse act" . . . "is necessary to" plausibly plead a retaliatory motive. *Id.* at 18 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). To the contrary, "it is only '[w]hen a party relies on the *mere* temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . that the temporal proximity must be very close.'" *Buchanan v. City*

*of New York*, 556 F. Supp. 3d 346, 361 (S.D.N.Y. 2021) (emphasis in original).[3] No case law

supports Defendants' efforts to disregard direct evidence of retaliatory intent entirely in favor of

strict temporal proximity, and it makes no logical sense to do so.

The 2023 letter does not serve as mere circumstantial evidence of retaliation because

Defendants directly admit in the letter that "the manner in which [the] paper reports county

business was one of the reasons the Board of Supervisors opted to change the official county paper

to the Hancock Herald in 2022."  Compl. Ex. G. They double down on this sentiment by claiming

that the de-designation should have "prompted an immediate change" in *The Reporter*'s coverage.

*Id*. Where a complaint alleges "direct evidence of retaliatory animus"—such as voicing displeasure

regarding protected speech—"independent of any inferences that could or could not be plausibly

drawn, with respect to the temporal proximity between the protected speech and the adverse

action," courts in the Second Circuit have found that "sufficient" to survive at the pleading stage.

*Stajic v. City of New York*, 214 F. Supp. 3d 230, 236 (S.D.N.Y. 2016).  If the Court were to find

that the letter's direct evidence of retaliatory intent, standing alone, is not enough, the Complaint

alleges abundant other direct and circumstantial evidence of retaliatory animus, including the

March 2022 letter complaining about coverage sent a week prior to the de-designation, the March

2022 e-mail from the Board Chair a day after the de-designation, the stories complained about in

the wake of the March 2023 letter, and the gag directive instituted only five days after *The New

York Times* ran a June 2023 story featuring the County's retaliatory de-designation. *See* Compl. ¶¶

---

[3]  The case law Defendants rely on involving mere temporal proximity between government's knowledge of protected activity and an adverse action is thus inapposite. *See Clark Cnty. Sch. Dist.*, 536 U.S. at 776 (holding that adverse "[a]ction taken . . . 20 months later [than the protected conduct] suggests, *by itself*, no causality" in the Title VII context) (emphasis added); *Figueroa v. Garland*, No. 1:21-CV-7849-GHW, 2023 WL 4865831, at *12 (S.D.N.Y. July 31, 2023) (rejecting claim that temporal proximity of three years between protected activity and adverse action was too distant when coupled with other direct and circumstantial evidence supporting causation); *Holmes v. Long Island R.R. Co.*, No. 96 CV 6196 (NG), 2001 WL 797951, at *8 (E.D.N.Y. June 4, 2001) (temporal proximity, standing alone, insufficient where no facts demonstrated that defendant even knew about protected activity).

37-40, 43, 74. Taken together, this evidence overwhelmingly supports the requisite causal connection to survive a motion at the pleadings stage.

Second, the temporal proximity between *The Reporter*'s relevant protected speech and adverse actions in fact supports denying Defendant's motion. The Complaint alleges that only six days after *The Reporter* published a March 2022 article on the removal of a judge from his criminal court duties that misstated the governing body that removed him, the County sent a letter that voiced officials' displeasure at *The Reporter*'s "history of writing" "selectively researched, one-sided" stories that "use[] sensationalism and exaggeration," "disparage[] [the County's] actions and cast[] its leaders in a materially false light."  Compl. ¶¶ 34-36. Despite the fact that *The Reporter* ran a correction concerning the error the very same day, only a week later the Board of Supervisors Defendants voted to de-designate *The Reporter* as an official paper, with the Board Chair confirming in writing to Plaintiff the following day that *The Reporter*'s Editor was one of the reasons for the de-designation. *See* Compl. ¶¶ 37-40, 43. And, in the months leading up to County officials sending a March 2023 letter again voicing displeasure at *The Reporter*'s coverage and admitting the coverage was a reason for the de-designation, a series of stories that certain officials later identified as coverage they disliked ran on the County's drone program between September 2022 and January 2023, a potential parks department in June 2022, and an arrest of an 11-year-old child for graffiti in the Town of Bovina in August 2022. *See* Compl. ¶¶ 65-72. The Second Circuit has found that similar or much longer periods of time to that alleged here can establish the necessary causal connection. *See, e.g.*, *Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) (six weeks "fits comfortably within any line we might draw" on proximity); *Cioffi*, 444 F.3d at 168 (2d Cir. 2006) ("several months after the letter and several weeks after the press

conference"); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 555 (2d Cir. 2001) (four or five months).

### D. *The Reporter* Has Standing to Challenge Defendants' Gag Directive.

News organizations, as "potential receivers of otherwise restrained speech" from "willing speakers," have standing to challenge restraints on speech. *See Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 607–08 (2d Cir. 1988). A "willing speaker" need not directly challenge the restraint and can be implied from his or her actions. *See id.* at 607 ("It is hard, in fact, to imagine that there are no willing speakers. Without them there would be no need for a restraining order; it would be superfluous."). Parties can be considered willing speakers where they decline to support the release of information "because they believe themselves bound by" agreements prohibiting the free flow of information. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 228–29 (4th Cir. 2019). When a willing speaker exists, the press has a right to receive speech. *See Dow Jones*, 842 F.2d at 607.

Plaintiff has plausibly pled the existence of a willing speaker here. Just like the willing speakers in *Overbey*, Mr. Ermeti declined to speak to *The Reporter* about a matter of public concern because he believed he was bound by a restraint on his speech. *See* Compl. ¶ 78 (noting he had "been directed to refer all inquiries in this matter and any other matter that pertains to the Public Defender's office to the County Attorney's office."). Further, because the true scope of Defendants' overbroad gag directive is unclear, it is likely that other willing speakers will be uncovered through discovery. Because a willing speaker exists and *The Reporter* has an interest in receiving information that pertains to matters of public concern, *The Reporter* has standing to challenge Defendants' gag directive as a form of unconstitutional prior restraint.

**E.      Defendants' Gag Directive Is An Unconstitutional Form of Prior Restraint.**

Defendants argue that they had a "rational basis" for their supposedly permissible "content neutral directive" demanding that employees refer all inquiries by *The Reporter* concerning County matters to the County Attorney's office. Def.'s Mot. at 22; Compl. ¶¶ 78-79. But Defendants' argument ignores that the Complaint's allegations, taken as true as they must be at this stage, plausibly allege that the directive constitutes an impermissible prior restraint that restricts County employees' and *The Reporter*'s rights to speak on matters of public concern. *See* Def.'s Mot. at 22.

A prior restraint, as opposed to a subsequent disciplinary action, is a government order or action "forbidding certain communications when issued in advance of the time that such communications are to occur." *Perry v. McDonald*, 280 F.3d 159, 171 (2d Cir. 2001) (citation omitted). "Prior restraints "are the most serious and least tolerable infringement on First Amendment Rights" because they "ha[ve] an immediate and irreversible sanction." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). In effect, they "freeze[]" speech. *Id.* For this reason, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (citation omitted).

The Second Circuit has long held that a blanket media policy "forbid[ding] employees from speaking with the media regarding any policies or activities of the agency without first obtaining permission" "run[s] afoul of the general presumption against prior restraints on speech." *Harman*, 140 F.3d at 115, 119 (affirming lower court judgment enjoining enforcement of two policies requiring pre-approval to speak with media). This pre-approval procedure "is generally disfavored under First Amendment law because it 'chills potential speech before it happens.'" *Id.* at 119 (citation omitted).

Here, like the press policies in *Harman*, Delaware County's gag directive restricted employee speech before it occurred. The County's directive is actually *more* restrictive than the unconstitutional policies in *Harman*, which theoretically could have permitted some employee speech provided it was approved by the agency's media relations department in advance. Mr. Ermeti's written response to *The Reporter*'s request for information sufficiently demonstrates at the pleading stage that he was prohibited from responding to "all inquiries in this matter and *any other matter* that pertains to the Public Defender's office[.]" Compl. Ex. P (emphasis added). Delaware County's overbroad gag directive thereby serves as a "wholesale deterrent to a broad category of expression[.]" *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 467 (1995). Even if Mr. Ermeti spoke to *The Reporter*'s Editor for another story after receiving approval, the fact remains that the overbroad directive issued by Ms. Merklen allowed Delaware County to control when and how newsworthy information relating to matters of public concern was released.

While Defendants puzzlingly claim that Ms. Merklen "cannot be said to have personal involvement" in this gag directive or "in any claims presented," Def.'s Mot. at 31, she is the County Defendant alleged to have the most involvement with the gag directive because she was responsible for its issuance. *See* Compl. ¶¶ 76-83. Accordingly, the Complaint adequately alleges Merklen's personal involvement in the claim for purposes of surviving the pleading stage, and Delaware County's gag directive must be analyzed as a prior restraint.

       1.       Defendants fail to meet their heavy burden of justifying their prior restraint.

As a threshold issue, Defendants argue that government employee speech is not protected under the First Amendment if it is directly related to their official duties. *See* Def.'s Mot. at 13 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). But *Garcetti* does not authorize blanket prior restraints on speech, and its holding, in any event, has largely been limited to cases involving

subsequent punishments as opposed to prior restraints. *See, e.g.*, *Liverman v. City of St. Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) (applying the *NTEU* standard, as opposed to *Garcetti*, to a police department policy imposing a blanket restriction on employees' negative social media comments regarding the department). The restraint at issue here is more like that in *NTEU*, which involved a facial challenge to an honoraria ban that operated as a prior restraint. *See NTEU*, 513 U.S. at 468.

Because prior restraints chill potential speech before it happens, they face a heavy presumption against constitutional validity and will be judged under a stricter standard than subsequent punishments. *See Bantam Books, Inc., v. Sullivan*, 372 U.S. 58, 70 (1963); *NTEU*, 513 U.S. at 468. Under *NTEU*, the government "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government[.]" *NTEU*, 513 U.S. 454 at 468. Further, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id*. at 475.

Defendants, who concede as they must that they have restrained government employee speech, argue that their restraint is justified because Defendants "seek to ensure legal standards are followed" in the face of pending litigation. Def.'s Mot. at 24. This explanation disingenuously fails to take into account that the bulk of *The Reporter*'s inquiries relate to the myriad of topics that arise in covering County government more generally and not to the de-designation specifically. Defendants have likewise failed to demonstrate any real anticipated harms posed by the proscribed speech that could overcome the heavy presumption against constitutionality. Accordingly, Plaintiff has plausibly alleged that Delaware County's gag directive is an unconstitutional form of prior restraint.

**F.    No Actual Chilling Effect Is Required to Plausibly Allege Independent Contractor Claims.**

Defendants argue that Plaintiff's claims fail because no adequate chilling effect is alleged. Def.'s Mot. at 25. But "it is well-settled that public employees" and independent contractors like Plaintiff "alleging retaliation for engaging in protected speech are not normally required to demonstrate a chill subsequent to the adverse action taken against them." *Gill v. Pidlypchak*, 389 F.3d at 382. Instead, their "essential burden is to show that he or she was punished, not that his or her speech was 'effectively chilled' from that point forward." *Id.*; *Morrison v. Johnson*, 429 F.3d 48, 51–52 (2d Cir. 2005) (finding lower court applied an erroneous standard of law when it dismissed First Amendment claims for failure to provide evidence of an actual chilling effect "[b]ecause a public employee alleging retaliation . . . is not normally required to show that the defendants' conduct had an actual chilling effect").

And even if that were not the case, Defendants' case law recognizes that certain non-speech related harms present here are sufficient to demonstrate a concrete injury for standing purposes, including, importantly, "losing a government contract[.]" *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 259 (E.D.N.Y. 2021). Defendants' de-designation of *The Reporter* resulted in the immediate loss of a government benefit. *See, e.g.*, Compl. ¶¶ 43, 61, 100. The County's gag directive issued by Ms. Merklen likewise immediately ended its Editor's questioning of Mr. Ermeti and had a chilling effect on Mr. Ermeti, the untold other County employees for which this directive chilled their speech, and *The Reporter*'s Editor by ending her inquiry at the time. *See, e.g.*, Compl. ¶¶ 77-80, 82; *see also McKenna v. Nassau Cnty.*, No. 223CV4286ARRST, 2023 WL 8455670, at *11 (E.D.N.Y. Dec. 6, 2023) (concluding plaintiff can experience an injury where a government action "immediately end[s] his First Amendment . . . activity" even if he may participate in the activity in the future). The Court should thus find that the claims are plausibly alleged.

## II.    *THE REPORTER* PLAUSIBLY PLED VIOLATIONS OF ITS RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

To bring a successful Equal Protection claim under the class-of-one theory, a plaintiff must show that it was intentionally treated differently from others similarly situated, and that there was no rational basis for that treatment. *See Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). A claim based on a class-of-one theory can be brought "[w]here, as here, a plaintiff does not claim to be a member of a constitutionally protected class[.]" *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013). While a plaintiff is not required to proffer evidence of similarly situated individuals at the motion to dismiss stage, the court 'still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated.'" *Id.* at 434.

Plaintiff has met its pleading burden by alleging that the County Attorney's office issued a gag directive targeted solely at communications between *The Reporter*'s staff and County employees only five days after *The New York Times* covered Defendants' retaliatory actions against *The Reporter*. *See* Compl. ¶¶ 74-83. The directive "bars otherwise willing speakers from communicating information of public concern to Plaintiff, but not to its peer media outlets," with "access to public employees and contractors . . . discriminatorily granted only to select media outlets." *Id.* ¶¶ 110-111, *see also id.* ¶ 113. Peer media outlets alleged in the Complaint include *The Hancock Herald* and *The Mountain Eagle*. *See, e.g., id.* ¶¶ 43, 51, 62-63, 85, 88-89. And only days after the County issued the gag directive, the Board of Supervisors invited the publisher of the newspaper it designated in place of *The Reporter* "to speak at length in apparent response to" a proposed resolution in support of *The Reporter*. *Id.* ¶¶ 84-85, 89.

*Cap. Cities Media, Inc. v. Chester*, 797 F.2d 1164 (3d Cir. 1986), is instructive. There, the Third Circuit vacated a decision dismissing an equal protection claim at the pleading stage, where

the complaint alleged that the government "has been discriminating between newsseekers, granting access to those favorably disposed to it while denying access to those whom it considers unfriendly." *Id.* at 1176. The Court vacated the decision despite the fact that "the complaint arguably approaches the outer edges of adequacy" in simply "cit[ing] the Fourteenth Amendment, contend[ing] that the agency's standards for granting or denying access are arbitrary and capricious, and demand[ing] as relief that the state be ordered to" promulgate a uniform public access policy. *Id.* at 1178 (Adams, J., concurring). The same result is compelled here.

Defendants argue that "the only basis for Plaintiff's Fourteenth Amendment claim is their alleged protected activity and retaliation for the same," and thus the claim "should be dismissed as duplicative" of the First Amendment claims. Def.'s Mot. at 29. But the case Plaintiff relies on for this proposition dismissed the equal protection claim after plaintiff failed to even "address defendants' argument that his Equal Protection claim is redundant of his First Amendment claim" or explain "how his journalism motivated" the adverse actions. *McKenna v. Nassau Cnty. News*, 2023 WL 8455670, *at 12 (E.D.N.Y. Dec. 6, 2023).

Here, *The Reporter*'s equal protection claim is not based just on the fact of the gag order itself, but also on the presumption that other newspapers in the area were free to communicate with County officials in their newsgathering endeavors. *See, e.g.*, Compl. ¶¶ 76-79; 110-113; *id.* Ex. P. Plaintiff's claim of First Amendment retaliation stems from the creation of the gag order itself, while Plaintiff's claim for equal protection lies in the differential treatment between Plaintiff and other similar papers reporting on the County. *The Reporter* thus has adequately alleged an equal protection claim that survives the pleading stage.

### III.    DEFENDANTS' MOUNT HEALTHY DEFENSE DOES NOT SUPPORT DISMISSAL OF PLAINTIFF'S FIRST CLAIM.

A *Mount Healthy* defense "is highly fact-intensive[,]" with the defendant bearing the burden of showing that it "would have taken the same adverse action in the absence of the protected speech[.]" *Severin v. New York City Dep't of Educ.*, No. 119CV00775MKVRWL, 2021 WL 1226995, at *8 (S.D.N.Y. Mar. 31, 2021) (citing *Sher v. Coughlin*, 739 F.2d 77, 82 (2d Cir. 1984) (noting that a "determination of th[e] issue of hypothetical causation requires fact-finding"). For this reason, it has been held repeatedly that "dismissal of a First Amendment retaliation claim based on a *Mount Healthy* defense is generally not appropriate at this early stage in the litigation." *Id.* at *8 (collecting cases); *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 n.1 (2d Cir. 2001) (summary order) ("*Mt. Healthy* sets forth the appropriate standard for a § 1983 claim at trial, not for a motion to dismiss based on the pleadings."); *Thomas v. Eby*, 481 F.3d 434, 442 (6th Cir. 2007) ("[Defendant] cites no case applying the *Mount Healthy* standard on a motion to dismiss, and for good reason—it makes little sense to apply it at the pleading stage."); *Maloy v. Ballori-Lage*, 744 F.3d 250, 253 (1st Cir. 2014) ("Typically, too, an assessment of a plaintiff's complaint does not entail consideration—much less require rebuttal—of the defendant's explanation for its action[.]").

Defendants do not cite a single case where a motion for judgment on the pleadings or a motion to dismiss was granted based on a *Mount Healthy* defense and provide no reason why the Court should take that extraordinary measure here. Defendants argue that Plaintiff does not plausibly plead a claim for First Amendment retaliation sufficient to overcome a *Mt. Healthy* defense for three reasons: 1) *The Reporter* "raised costs in a manner it had not done in decades"; 2) *The Reporter* switched to a statewide automated system for placing legal notices that "forced its clients to use an online system;" and 3) *The Reporter* showed a lack of support for the

designating party and purportedly "had developed a pattern and practice of bad reporting[.]" *See* Def.'s Mot. at 26-28. Each of these alleged motivations is insufficient for Defendants to carry their heavy burden to demonstrate they would have de-designated *The Reporter* in the absence of its protected speech.

While Defendants claim—despite their admission in their March 2023 letter to the contrary—that their motive for switching newspapers was solely motivated by cost concerns, a court faced with that same argument at the summary judgment stage credited "circumstantial evidence" also present here in finding that a newspaper had demonstrated sufficient evidence for a reasonable jury to "conclude that a retaliatory motive was a substantial factor in Defendant's decision." *Greeley Publ'g Co. v. Hergert*, No. CIV.A. 05-CV-00980EW, 2006 WL 1581754, at *10 (D. Colo. June 6, 2006). Like the Defendants here, the government official in *Greeley* pointed to editorial coverage when asked about the switch and did not claim to have conducted a survey of other papers' rates prior to switching newspapers. *Id*. at *11. Nor did Defendants take into account that the rate increase merely conformed *The Reporter*'s rates "to the statutorily mandated public notice rates that have not increased in New York State since September of 1990." Compl. ¶ 46. *The Reporter*'s case is even stronger than the facts presented in *Greeley* because the County's letter and the e-mail from the Board of Supervisors Chair serve as *prima facie* evidence of retaliation given the direct admissions of de-designation due to the newspaper's coverage. *See id.* Exs. E, G.

Defendants' remaining two claims fare no better. Defendants provide no adequate explanation for how switching to a user-friendly online portal to place legal notices, which typically takes clients mere "minutes" to do, could serve as a valid basis for de-designation. *See id.* ¶ 47. Nor can they explain how *The Reporter*'s purported lack of support for a political party

is a valid reason, standing alone, to de-designate a newspaper, given that "County Law § 214 explicitly permits the designation of "independent newspaper[s] not advocating the principles of any political party." Compl. ¶ 88.   While Defendants assert that *The Reporter*'s so-called "inaccurate" "bad reporting" justifies de-designation, Def.'s Mot. at 27-28, our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open" leads to the conclusion that constitutional protection necessarily extends to inaccurate statements unless made with knowing or reckless disregard for the truth. *Sullivan*, 376 U.S. at 270. Because Defendants fail to demonstrate this is an exceptional case where a *Mount Healthy* defense should be considered at the pleadings stage, Defendants' motion should be dismissed.

## IV.   DEFENDANTS ARE NOT ENTITLED TO LEGISLATIVE IMMUNITY FOR THEIR DE-DESIGNATION OF *THE REPORTER*.

Defendants argue that all Board of Supervisors Defendants except Board Chair Molé are shielded from liability for actions related to their positions due to legislative immunity, including for any "votes," "deliberations" related to votes, and "discretionary actions like those under County Law § 214." Def.'s Mot. at 31. But no case law supports this overbroad interpretation. The Second Circuit has instead found that legislative immunity applies only to a narrow set of activities that are truly "legislative" in nature.  *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 210 (2d Cir. 2003). Immunity under this test "depends on the nature of the act itself," where "the act in question must be taken 'in the sphere of legitimate legislative activity.'" *Id.*

While this Circuit has generally "recognized that '[t]he act of voting is 'quintessentially legislative'" when "a vote reflects a 'discretionary, policymaking decision,'" a vote regarding the "failure to rehire" an employee or contractor is not subject to legislative immunity because it is "an administrative personnel matter." *Zdziebloski v. Town of E. Greenbush, N.Y.,* 336 F. Supp. 2d 194, 203 (N.D.N.Y. 2004); *see also Rubeor v. Town of Wright,* 191 F. Supp. 3d 198, 204 (N.D.N.Y.

2016) (holding legislators not entitled to legislative immunity for "[a]dministrative firing[]" or similar action that effectively "ended the [government's] relationship with" an employee or contractor). "Administrative" decisions targeted "at a particular employee or employees" rather than "a broader legislative policy" do not qualify for legislative immunity, even if accompanied by a vote, because they are not "the kind of broad, prospective policymaking that is characteristic of legislative action." *Harhay*, 323 F.3d at 211 (holding board members not entitled to legislative immunity when voting to table a resignation because it was an administrative decision directed to the employee's situation); *Almonte v. City of Long Beach*, 478 F.3d 100, 108 (2d Cir. 2007).

Board of Supervisors Defendants' actions in de-designating *The Reporter* and in deliberating over whether to re-designate it concern a quintessentially administrative personnel decision to fire and not rehire a particular independent contractor rather than any "broader legislative policy" and thus plainly do not qualify for legislative immunity. *Almonte*, 478 F.3d at 108. Likewise, Defendants' actions in signing a March 2023 letter voicing their displeasure over *The Reporter*'s coverage that was run verbatim on another newspaper's front page is not protected by legislative immunity because it is outside the legislative sphere. The legislative sphere "reaches things 'generally done in a session of the [legislature] by one of its members in relation to the business before it.'" *Kent v. Ohio House of Representatives Democratic Caucus*, 33 F.4th 359, 365 (6th Cir. 2022) (citing *Gravel v. United States*, 408 U.S. 606, 623-24 (1972)). Legislative immunity does not extend to activities wholly outside this sphere like sending a letter complaining about a newspaper's coverage that ran as a news release in *The Mountain Eagle*. *Id.* at 367 ("[L]egislative immunity does not cover preparing . . . news releases, and speeches delivered outside" the legislative chamber).

## V.    *THE REPORTER*'S CLAIMS ARE NOT BARRED BY THE AVAILABILITY OF STATE ACTION UNDER ARTICLE 78.

Defendants argue that Plaintiff's claims should fail because it was purportedly required to have the de-designation decision reviewed by a New York Court under CPLR § 7801. *See* Def.'s Mot. at 11. But Plaintiff is not required to exhaust administrative remedies before pursuing constitutional violation claims under Section 1983. *See Heck v. Humphrey*, 512 U.S. 477, 480 (1994) (citing *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 501 (1982)). The existence of prior challenges to designation under Article 78 do not obligate plaintiffs to choose the same route, especially considering that the cases cited by the Defendants in support of their alleged "exhaustion requirement" bear no resemblance to this case. In *Myers-Brooks Pub. Co.*, a newspaper alleged that it was entitled to automatic designation because it was one of the only two newspapers published within the county. *See Myers-Brooks Pub. Co. v. Bd. of Sup'rs of Fulton Cnty.*, 68 Misc. 2d 1033, 1033-34 (Sup. Ct., Fulton Cnty. 1972).  And *News-Review Pub. Corp.* concerned whether the designation of a Democratic newspaper by the Democrat county executive was void when no members of the board of supervisors were Democrats. *See News-Rev. Pub. Corp. v. Lomenzo*, 53 Misc. 2d 370, 371–72 (Sup. Ct., Suffolk Cnty.), *aff'd*, 28 A.D.2d 823, 282 N.Y.S.2d 670 (1967). Neither case involved a constitutional claim nor substantiated a need to exhaust administrative remedies. Therefore, *The Reporter*'s claims should not be dismissed because their § 1983 claims are not barred by the availability of an Article 78 proceeding.

## CONCLUSION

For all these reasons, the Court should deny Defendants' Motion for Judgment on the Pleadings in its entirety.

Date: June 24, 2024

By: _HE Murray_____

Heather E. Murray                    Michael J. Grygiel
Mark H. Jackson                      GREENBERG TRAURIG, LLP
CORNELL LAW SCHOOL                   54 State Street, 6th Floor
FIRST AMENDMENT CLINIC[4]            Albany, NY 12207
Myron Taylor Hall                    Tel.: (518) 689-1400
Ithaca, NY 14853                     Email: grygielm@gtlaw.com
Tel.: (607) 255-8518
Email: hem58@cornell.edu
        mhj35@cornell.edu

*Counsel for Plaintiff Decker Advertising Inc.*

---

[4] Clinic students Evan Deakin, Matthew Hornung, Sabrina Palacios, Iain Smith, and summer fellows Paul Janes and Celina Rivernider drafted portions of this brief. The Local Journalism Project and the Clinic are housed within Cornell Law School and Cornell University. Nothing in this Complaint should be construed to represent the views of these institutions, if any.