**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

DECKER ADVERTISING INC.,

               Plaintiff,

    v.                                               3:23-cv-1531 (AMN/ML)

DELAWARE COUNTY, NEW YORK; and TINA
MOLÉ; ARTHUR MERRILL; MARK TUTHILL;
THOMAS AXTELL; JEFFREY TAGGART;
WAYNE E. MARSHFIELD; JERRY VERNOLD;
JAMES E. EISEL; GEORGE HAYNES, JR.;
BETTY L. SCOTT; JAMES G. ELLIS; CARL
PATRICK DAVIS; ALLEN R. HINKLEY; ERIC
T. WILSON; JOHN S. KOSIER; WILLIAM
LAYTON; JOSEPH CETTA; and AMY
MERKLEN, in their individual and official
capacities,

               Defendants.

---

**APPEARANCES:**                            **OF COUNSEL:**

**CORNELL LAW SCHOOL FIRST**        **HEATHER E. MURRAY, ESQ.**
**AMENDMENT CLINIC**               **MARK H. JACKSON, ESQ.**
Myron Taylor Hall
Ithaca, NY 14853
*Attorneys for Plaintiff*

**GREENBERG TRAURIG, LLP**        **MICHAEL J. GRYGIEL, ESQ.**
54 State Street, 6th Floor
Albany, NY 12207
*Attorneys for Plaintiff*

**HANCOCK ESTABROOK, LLP**        **FRANK W. MILLER, ESQ.**
1800 AXA Tower I                       **GIANCARLO FACCIPONTE, ESQ.**
100 Madison Street
Syracuse, NY 13202
*Attorneys for Defendants*

**Hon. Anne M. Nardacci, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.     INTRODUCTION

On December 4, 2023, Plaintiff Decker Advertising Inc. ("Decker" or "Plaintiff") commenced this action pursuant to 42 U.S.C. § 1983 ("§ 1983") against Defendants Delaware County, New York ("County"), Chairperson of the Delaware County Board of Supervisors Tina Molé ("Chairperson"), and members of the County Board of Supervisors (the "Board") Arthur Merrill, Mark Tuthill, Thomas Axtell, Jeffrey Taggart, Wayne E. Marshfield, Jerry Vernold, James E. Eisel, George Haynes, Jr., Betty L. Scott, James G. Ellis, Carl Patrick Davis, Allen R. Hinkley, Eric T. Wilson, John S. Kosier, William Layton, Joseph Cetta, and Amy Merklen ("Board Members") alleging violations of the First and Fourteenth Amendments.   Dkt. No. 1 ("Complaint").   Defendants' motion pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings is fully briefed and pending before the Court.   Dkt. No. 42 (the "Motion"), Dkt. No. 56, Dkt. No. 57.   For the reasons that follow, the Motion is granted in part and denied in part.

### II.     BACKGROUND

The following facts are drawn from the Complaint and the exhibits attached to the Complaint unless otherwise noted and are assumed to be true for purposes of ruling on the Motion. *See Div. 1181 Amalg. Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (*per curiam*); *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (in reviewing defendant's "motion for judgment on the pleadings, [the court] draw[s] all facts—which [the court] assume[s] to be true . . . from the Complaint and the exhibits attached thereto[.]").

#### A.     The De-Designation

Plaintiff publishes *The Reporter*, a Catskills-based newspaper distributed in the County

and online.  Dkt. No. 1 at ¶ 10.  New York County Law § 214(2) ("§ 214(2)") provides that "[t]he board of supervisors shall annually designate at least two newspapers published within the county as official newspapers for the publication of all local laws, notices and other matters required by law to be published."  For decades, the County designated *The Reporter* as an official county newspaper for the publication of local laws and notices, as required by § 214(2).  *Id.* at ¶¶ 31, 32.  In accordance with that precedent, on January 5, 2022, the County designated *The Reporter* as an official newspaper for the publication of local laws and notices for the calendar year 2022.  *Id.* at ¶ 33.  *The Reporter* and *The Mountain Eagle* are the only two local newspapers in Delaware County with county-wide reach.  *Id.* at ¶ 85.

In February 2022, after *The Reporter*'s designation under § 214(2) for the calendar year, the newspaper switched to a "statewide automated system" for placing notices with the aim of making the process more efficient.  *Id.* at ¶ 44.  *The Reporter* alleges that during its upgrade to the automated system, the newspaper learned that it had historically undercharged for legal notice placement.  *Id.* at ¶ 45.  Therefore, it "corrected its rates to reflect the standard rates provided on the statewide portal."  *Id.* at ¶ 45.  The new rates allegedly conform with statutorily mandated public notice rates.  *Id.* at ¶ 46.  After switching to the new automated system, *The Reporter* offered its clients a free 15-minute training.  *Id.* at ¶ 47.

On March 9, 2022, *The Reporter* published a news article titled *Delhi Justice Removed From Criminal Cases*, which reported that a local justice was removed from his criminal court duties after an attorney filed a complaint against him.  *Id.* at ¶¶ 34-35.  A few days later, on March 15, 2022, the County sent a letter to *The Reporter* in which the County claimed that the article misreported the governing body which had removed the justice from his criminal court duties, requested a correction of that mistake, and generally alleged that *The Reporter*'s Editor "ha[d] a

history of writing stories about Delaware County which are selectively researched, one-sided and ignore or minimize any facts incompatible with her intended narrative." *Id.* at ¶¶ 35-36. The letter also stated that the Editor "often uses sensationalism and exaggeration to play on the emotions, prejudices, and fears of her readers, undermining their confidence in our County government by disparaging its actions and casting its leaders in a materially false light." *Id.* On the same day it received the letter, *The Reporter* ran a correction of the article. *Id.* at ¶ 37.

A week later, on March 23, 2022, the County revoked *The Reporter*'s designation as an official county newspaper for the publication of local laws and notices under § 214(2). *Id.* at ¶ 39. The Board Members named as defendants each voted for the de-designation. *Id.* at ¶ 40. According to the official resolution, *The Reporter* was de-designated because "the cost of placing a legal notice in *The Reporter* has doubled since the beginning of 2022, along with the amount of time it takes to successfully place the notices, affecting not only that Department's budget, but also the Department's workload." *Id.* at ¶ 41. The day after the de-designation, one of Plaintiff's co-owners, Randy Shepard, asked Defendant Tina Molé about the de-designation. Ms. Molé replied the decision was made due to "[t]he dramatic increase in price and the County having to do the work *and Lillian*[,]" referring to *The Reporter*'s Editor. *Id.* at ¶ 43 (emphasis added).

In *The Reporter*'s place, the County designated *The Hancock Herald* under § 214(2). *Id.* at ¶ 48. Plaintiff alleges, upon information and belief, that the County did not contact or conduct due diligence on *The Hancock Herald* prior to its designation to publish local laws and notices. *Id.* at ¶ 50. On January 4, 2023, the next year, the County again designated *The Hancock Herald* under § 214(2) and did not designate *The Reporter*. *Id.* at ¶ 49. Later that year, during a June 28, 2023 Board meeting, the publisher of *The Hancock Herald* stated that she did not know in advance that the Board was going to designate *The Hancock Herald* for publishing local laws and notices

in place of *The Reporter*.  She also acknowledged that its circulation was smaller than *The Reporter*'s and that, at the time it was initially designated, *The Hancock Herald* did not publish legal notices online.  *Id.* at ¶¶ 50, 51.

### B.    The Letter

On March 8, 2023, the County sent another letter to the publishers of *The Reporter* demanding that the newspaper "make immediate changes" to its coverage of the County.  *Id.* at ¶ 57; *see also* Dkt. No. 1 (Exhibit G) ("Letter").  Thirty-nine County officials signed the Letter, including all Board Members named as Defendants except James E. Eisel and Betty L. Scott.  *Id.* at ¶ 58.  The Letter also stated that the alleged "flagrant manipulation of facts and the manner in which [the] paper reports county business was one of the reasons the Board of Supervisors opted to change the official county paper to the Hancock Herald in 2022."  *Id.* at ¶ 60.  The Letter went on to assert that the de-designation "should have signaled to you a problem in the operations of [the newspaper's] business and prompted an immediate change."  Dkt. No. 1 (Exhibit G) at 1.[1] Shortly after receiving the Letter, the publishers of *The Reporter* reached out to several signatories. *Id.* at ¶ 64.  When asked why the letter was sent, some signatories cited specific stories published by *The Reporter* including a series of articles on the County drone program, an article regarding the arrest of an 11-year-old for graffiti on town property, and a story regarding the possible creation of a County parks department.  *Id.* at ¶¶ 66-72.  During these conversations with County officials, the publishers of *The Reporter* encouraged the officials to reach out personally if a correction was warranted in any of the newspaper's stories in the future.  *Id.* at ¶ 73.

---

[1] Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

C.    *The New York Times* **Story and the Directive**

Three months later, on June 18, 2023, *The New York Times* covered the County's de-designation of *The Reporter*. *Id.* at ¶ 74; *see also* Dkt. No. 1 (Exhibit O). The article included a quote from Mr. Wayne Marshfield, a signatory of the Letter, in which he asserted that he only signed the Letter "to support his colleagues[,]" and that the County "claim[ed] that *The Reporter* would publish biased articles." *Id.* at ¶ 75.

Five days after *The New York Times* published the story, Plaintiff alleges that the County Attorney's Office issued a directive to County employees requiring that all requests for comment from *The Reporter* be referred to the County Attorney's Office. *Id.* at ¶ 76 (the "directive"). Soon after the story was published, on June 22, 2023, *The Reporter*'s Editor contacted County Public Defender Joseph Ermeti in relation to a separate story to confirm "who authorizes, creates and does the posting on the Delaware County Public Defender Facebook account[.]" *Id.* at ¶ 77. In line with the alleged directive, Mr. Ermeti responded to *The Reporter*'s inquiry regarding the Facebook page by asserting that he had "been directed to refer all inquiries in this matter and any other matter that pertains to the Public Defender's office to the County Attorney's office." *Id.* at ¶ 78. After *The Reporter*'s Editor followed up with the County Attorney Defendant Amy Merklen, Ms. Merklen clarified that, "[s]ince the Reporter is represented by counsel and is contemplating litigation against the County, any and all communication should go through your attorney." *Id.* at ¶ 79. Despite lacking direct allegations as to *The Reporter*'s role in the publishing of *The New York Times* story, reading the allegations in the light most favorable to Plaintiff, and considering the contents of the attached story, the Court construes the Complaint to allege that the directive was imposed in retaliation for *The Reporter*'s apparent cooperation with *The New York Times* and the resulting coverage. *See* Dkt. No. 56 at 18 ("The Complaint demonstrates that *The Reporter*'s

Co-owners spoke about the de-designation to a New York Times reporter").

    *The Reporter* followed up with Ms. Merklen on June 28, 2023 and July 5, 2023 and asked that the alleged "overbroad directive" be rescinded.  *Id.* at ¶¶ 80, 81.  Plaintiff asserts that "[i]t remains unclear how many employees were directed not to speak to *The Reporter*'s journalists and whether this directive continues to be enforced."  Plaintiff also claims that the County has not responded to its most recent demand to rescind the directive.  *Id.* at ¶ 83.  However, Plaintiff acknowledges that Mr. Ermeti did respond to a later request for comment on a separate issue, though only after he ran the request by Ms. Molé.  *Id.* at ¶ 82.

    **D.**    **Later Events**

    After the de-designation of *The Reporter* and the alleged directive, the Delaware County Democratic Committee proposed a resolution to re-designate *The Reporter* as an official County paper for the purpose of publishing local laws and notices.  Dkt. No. 1 (Exhibit Q); *see also* Dkt. No. 1 at ¶ 84.[2]  In response, Ms. Merklen told the Democratic Committee chair that the proposed resolution did not comply with § 214 because the party could not designate more than one

---

[2] At various points, Defendants appear to draw a distinction between § 214(2), which governs designation for local laws and notices, and § 214(1), which governs designation for resolutions and elections notices, and at other times they conflate or confuse the two statutory provisions. Dkt. No. 42-2 at 20 (referring to § 214(1) in its discussion of the de-designation under § 214(2)); Dkt. No. 57 at 10 (same).  Most notably, Defendants contend that the Delaware County Democratic Committee put forward the re-designation resolution under § 214(1), not § 214(2).  *See* Dkt. No. 42-2 at 10 (stating the "Delaware County Democratic contingent put forward a proposed resolution to designate *The Reporter* . . . this time . . . under § 214(1).)"; Dkt. No. 57 at 7 (stating that the Board had a debate to re-designate *The Reporter* under § 214(1)).  However, the Delaware County Democratic Committee's proposed resolution indicates that it sought to designate *The Reporter* for local laws and notices, the province of § 214(2).  *See* Dkt. No. 1 (Exhibit Q).  The Court does not, and need not, weigh in on this apparent discrepancy, the proper interpretation of these two provisions, or the designation procedures they require.  To the extent that the Court must assess either of the provisions, the relevant language is the same between § 214(2) and § 214(1); both require consideration of a newspaper's political tendencies but expressly allow for the designation of newspapers which do not "advocat[e]" on behalf of political parties.  *Infra* Section IV(A)(1)(iii).

newspaper in a calendar year.  *Id.* at ¶ 87.  Plaintiff and the County Democratic Committee disagree

with the notion that § 214 limited their ability to designate more than one newspaper in 2023, and

on October 11, 2023, the Democratic Committee again recommended that *The Reporter* be

designated as the party's newspaper of record for the following year, 2024.  *See* Dkt. No. 1 (Exhibit

S).  At the time the Complaint was filed, the Board had not responded to the recommendation.  *Id.*

at ¶ 96.

Separately, on August 22, 2023, *The Reporter* sent a demand letter to the County requesting

immediate reinstatement and compensation for the lost revenue resulting from its allegedly

unlawful de-designation.  *Id.* at ¶ 97.  Two months later, counsel for the County sent a letter

rejecting those demands.  *Id.* at ¶ 98.

This lawsuit followed.  In it, Plaintiff claims that the County, Ms. Molé, Ms. Merklen, and

the Board Members violated Plaintiff's First and Fourteenth Amendment rights.  *See id.*  The

Complaint includes two counts: the first explicitly references retaliation and focuses on the de-

designation, and the second focuses on the alleged directive.  *Id.* at 20-21.  On May 2, 2024,

Defendants moved for a judgment on the pleadings.  Dkt. No. 42.

## III.    STANDARD OF REVIEW

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical

to that for granting a Rule 12(b)(6) motion for failure to state a claim."  *Lively v. WAFRA Inv.*

*Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d

67, 75 (2d Cir. 2020)).  A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6)

tests the legal sufficiency of a party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12

(2d Cir. 2007).  In considering legal sufficiency, a court must accept as true all well-pled facts in

the complaint and draw all reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc.*

*v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This presumption, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleadings, the court may consider documents that are "integral" to the pleadings even if they are neither physically attached to, nor incorporated by reference into, the pleadings.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir.2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to show that the pleader is entitled to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted).  Under this standard, a pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, their complaint must be dismissed."  *Id.* at 570.

## IV.    DISCUSSION

### A.  First Amendment Retaliation Claims

Plaintiff seemingly asserts claims of First Amendment retaliation based on 1) the de-

9

designation of *The Reporter*, and 2) the alleged directive to run *The Reporter*'s requests for comment by certain County officials. "First Amendment retaliation claims typically arise in three distinct contexts: prisoners, public employees, and criticism of public officials by private citizens." *Doe v. City of New York*, 18-cv-670 (ARR) (JO), 2018 WL 3824133, at *11 (E.D.N.Y. Aug. 9, 2018). The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). Here, when the County de-designated *The Reporter*, the parties agree that Plaintiff was operating as a "third party contractor[]" which is "subject to the same standards for protected speech as government employees" because the County contracted with *The Reporter* to publish legal notices. Dkt. No. 42-2 at 12; Dkt. No. 56 at 30; *see also Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 684–85 (1996) ("Independent government contractors are similar in most relevant respects to government employees . . . . We therefore conclude that the same form of balancing analysis should apply to each"); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir.1993) (recognizing that a towing company which informally contracted with a town was considered a public employee in the First Amendment retaliation context); *El Dia, Inc. v. Governor Rossello*, 165 F.3d 106, 110 (1st Cir. 1999) (recognizing a newspaper was an "independent contractor" for First Amendment purposes where the government previously paid to advertise in the newspaper). In contrast, when the County allegedly directed its employees not to speak with *The Reporter*, that relationship had terminated. Though the parties have failed to address this distinction, the Court addresses the allegations of retaliation separately, applying the standard for public employees and independent contractors to the first set of allegations, and applying the standard for private citizens criticizing public officials to the second set of allegations.

10

## 1. De-Designation

First, Plaintiff asserts that the County de-designated *The Reporter* in March 2022 in retaliation for *The Reporter*'s unfavorable coverage.[3]  To assert a claim of First Amendment retaliation in the public employment or contractor context, Plaintiff must allege the following: "(1) he engaged in speech or activity that was protected by the First Amendment; (2) he suffered an adverse employment action; and (3) a causal connection existed between the adverse action and the protected activity." *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021); *see also Brooke v. County of Rockland*, 21-598-cv, 2022 WL 6585350, at *2 (2d Cir. Oct. 11, 2022) (asserting that the same standard applies to independent companies which contract with the government).  The Court finds that the Complaint properly alleges a retaliation claim based on the de-designation.

## i. Protected Speech

First, Plaintiff must allege that the de-designation occurred in response to protected speech. *See Specht*, 15 F.4th at 600.  "The speech of a public employee is protected by the First Amendment when the employee speaks as a citizen[4] on a matter of public concern, rather than pursuant to his employment responsibilities." *Id.*; *see also McGuire v. Warren*, 207 Fed. Appx.

---

[3] To the extent that Defendants argue that *The Reporter*'s designation was discretionary, and therefore, Plaintiff holds no First Amendment rights in relation to its designation, the Court disagrees.  The County "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  This is true "even though [the Plaintiff] has no 'right' to the . . . benefit." *Id.*  Indeed, courts have found violations of First Amendment rights where the government withdrew advertising from newspapers in response to critical coverage, much as the County is alleged to have done here.  *See, e.g., El Dia*, 165 F.3d at 109-10; *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1337 (5th Cir. 1986).

[4] The parties do not appear to dispute, and the Court finds, that *The Reporter* was speaking as a citizen, rather than as a contractor of the County, in relation to the coverage prior to the de-designation. *The Reporter*'s employment relationship with the County was limited to posting legal notices and did not include its general news coverage.

34, 36 (2006) (applying the same standard for an individual public contractor); *Brooke*, 2022 WL 6585350, at *2 (applying the same standard based on the speech of an individual representing a contracted company); *Heusser v. Hale*, 777 F. Supp. 2d 366, 377 (D. Conn. 2011) (applying the same test to the speech of a contracted towing company). "Whether speech is on a matter of public concern presents a question of law that takes into consideration the content, form, and context of a given statement." *Id.* "Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public." *Id.* "To identify matters of public concern, 'we consider the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large[.]'" *Id.* (quoting *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014) (internal quotation marks and alterations omitted)). "Speech by a public employee is on a matter of public concern if it related to 'any matter of political, social, or other concern to the community.'" *Johnson v. Gamin*, 342 F.3d 105, 112 (2d. Cir. 2003) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

The Court has no difficulty in determining that *The Reporter*'s article covering the removal of a judge from his criminal court duties—the article which allegedly, in part, prompted the initial de-designation—involves a matter of public concern and constitutes protected speech. *See Specht*, 15 F.4th at 601 ("possible governmental misconduct is a legitimate and an important topic of public concern"); *see also Reuland v. Hynes*, 460 F.3d 409, 418 (2d Cir. 2006) ("[c]ertainly crime is a matter of political, social, or other concern to the community"). Defendants make two arguments attempting to avoid this conclusion, both of which are unavailing.

First, Defendants contend that the article's inclusion of an error, which *The Reporter* later

corrected, rids it of First Amendment protections.  Dkt. No. 42-2 at 15 (citing *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 301 (1971)).  The Court disagrees.  In *New York Times v. Sullivan*, the Supreme Court "refused to recognize an exception for any test of truth" because "erroneous statement is inevitable in free debate[,]" which "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive[.]'" 376 U.S. 254, 271-72 (1964) (internal citations omitted).  More recently, the Supreme Court explicitly rejected the notion that "false statements, as a general rule, are beyond constitutional protection."  *U.S. v. Alvarez*, 567 U.S. 709, 718 (2012).  Indeed, "the Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment."  *Id.* at 719.  Moreover, Defendants misconstrue their proffered case, *Ocala Star-Banner Co. v. Damron*, which in fact reversed a prior judgment on the basis that the judgment assumed a published falsehood was afforded no First Amendment protection without regard to principles established in *Sullivan*.  *Ocala Star-Banner Co.*, 401 U.S. at 300.  Defendants' sole cited language from *Ocala Star-Banner Co.* is dicta from the non-binding concurrence of Justice White, which itself recognized that publishers who spread false information are sometimes protected under the First Amendment because "otherwise the truth would too often be suppressed."  *Id.* at 301.  In summary, Defendants' contention that the presence of some false information in otherwise protected speech removes all First Amendment protection has no basis in the law.  In fact, "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974).  Thus, that the article contained an inaccurate statement is insufficient, on its own, to bring *The Reporter*'s speech outside of the First Amendment's protections.[5]

---

[5] Moreover, the Complaint and its supporting materials can also be read to plausibly allege that the de-designation was retaliation not just for the article reporting on the criminal court, but instead, *The Reporter*'s general coverage of the County.  Indeed, the Letter states, ". . . the manner

Second, Defendants argue that the de-designation is a personal business concern and not a matter of public concern. Dkt. No. 42 at 15. But Defendants confuse the issues. It is true that speech motivated by private business concerns and relating to non-public matters is not protected speech for purposes of a public employee or contractor's First Amendment retaliation claim. *See Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999) ("speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern."). However, whether the Government's alleged act of retaliation itself strikes at the personal business concerns of Plaintiff has nothing to do with whether Plaintiff's speech which prompted the retaliation is protected. What matters is not whether the de-designation was motivated by, or implicated, personal business concerns, but whether *The Reporter*'s preceding coverage addressed public concerns. *Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 313 (2d Cir. 2005) ("Public accusations of improper governmental actions are clearly matters of public concern, regardless of whether the accuser is motivated by personal reasons."). As discussed above, because the coverage related to government misconduct, it did. *See Specht*, 15 F.4th at 601.

---

in which [the] paper reports county business was one of the reasons the Board of Supervisors opted to change the official county paper . . . ." Dkt. No. 1 at ¶ 60. The day after the de-designation, Defendant Molé also stated that *The Reporter*'s Editor was a reason for the de-designation without direct reference to the specific article concerning the criminal court. *Id.* at ¶ 43. And in a letter sent before the de-designation, the County complained of *The Reporter*'s "history of writing stories about Delaware County which are selectively researched . . .". *Id.* at ¶ 36. Thus, the Court finds that the Complaint plausibly alleges that multiple instances of protected speech caused the alleged retaliatory de-designation. The Complaint is silent as to the factual accuracy of those other stories beyond the County's self-serving descriptions of *The Reporter*'s coverage. Therefore, even if the presence of false information in the article concerning the criminal court precluded First Amendment protection, the Court would not dismiss the retaliation claim based on the de-designation because other protected speech is plausibly alleged.

### ii.  Adverse Action

Next, Plaintiff must allege that the de-designation constitutes an adverse action.  Instead of addressing the nature of the deprivation and whether it is sufficiently detrimental to constitute an adverse action, the parties discuss whether the County was entitled to de-designate *The Reporter* under the provisions of § 214.  The Court will address those issues in its discussion of whether retaliation was a substantial or motivating factor for the de-designation, not whether the de-designation constituted an adverse event.

The Court easily finds that the de-designation of *The Reporter* constitutes an adverse action capable of sustaining a claim for retaliation in the public employment context.  "[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006).  "[R]etaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action" in the context of a First Amendment retaliation claim.  *Id.* at 225.  "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  *Id.* (quoting *Morris v. Landau*, 196 F.3d 102, 110 (2d Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127, 163 (2d Cir. 2012)).  However, "a combination of seemingly minor incidents" also qualifies. *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).

Here, *The Reporter* was effectively discharged from its role as an official County newspaper.  Courts generally treat the termination of a contractor's agreement with the Government as sufficient to constitute an adverse employment action.  *See Umbehr*, 518 U.S. at 685 (establishing that the "termination of [a contractor's] contract" would be a sufficient basis to assert a First Amendment retaliation claim); *Golodner*, 770 F.3d at 207 (noting that the

government may not "terminate their relationships with independent contractors because of the contractors' speech."). That the allegations here concern a de-designation pursuant to § 214 rather than a strict termination of a contract does not change the result. Whether through de-designation or termination, Plaintiff alleges that the County effectively ended its official relationship with *The Reporter*. It is plausible that the threat of de-designation would likely deter other newspapers in a similar position from publishing similar coverage. *Zelnik*, 464 F.3d at 225; *see also Davis v. Good*, 320 F.3d 346, 354 (2d Cir. 2006) (finding, at the motion to dismiss stage, that plaintiff "should have the opportunity to develop facts that would demonstrate that [the actions] would deter a [similarly situated individual]") (internal quotation marks omitted). Therefore, the Court finds that the Complaint sufficiently alleges that the de-designation is an adverse employment action.

### iii. Causal Connection

Finally, Plaintiff must allege a causal connection between the decision to de-designate *The Reporter* and its protected reporting. Defendants first contend that there is no such connection because the de-designation of *The Reporter* resulted from its ineligibility under § 214. Dkt. No. 42-2 at 20-21. In short, Defendants argue that under § 214, a newspaper designated to publish local laws and notices may be deemed ineligible for designation as a matter of law if it "fails to support the nominees or office holders" of one of two major political parties in the County. *Id.* Here, Defendants argue that because *The Reporter* "reported misinformation," and because the County "took issue with" its Editor's reporting about County officials, the County was entitled to de-designate it as the official newspaper. *Id.* Second, Defendants contend that there is insufficient temporal proximity between the protected speech and the adverse action to establish causation. *Id.* at 24. Finally, Defendants assert a *Mount Healthy* defense and point to costs and changes in the way the County was required to post notices with *The Reporter* as confounding causes of the de-

designation. *Id.* at 32-33 (citing *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)). In turn, Plaintiff disputes Defendants' characterization of § 214, Dkt. No. 56 at 19, insists abundant evidence exists to establish causation outside of mere temporal proximity, *id.* at 23-25, and argues that it is too early to determine whether the County would have made the same de-designation decision absent its protected activity due to rising costs and changes in the system for posting notices, *id.* at 33. The Court finds that the Complaint plausibly alleges a causal connection.

"The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Stajic v. City of New York*, 214 F. Supp. 3d 230, 235 (S.D.N.Y. 2016) (quoting *Morris*, 196 F.3d at 110). "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003). In cases relying on the circumstantial evidence of temporal proximity, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Anderson v. State of New York, Office of Court Admin.*, 614 F. Supp. 2d 404, 430 n.219 (S.D.N.Y. 2009). Direct evidence of retaliatory animus may take the form of "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged retaliatory attitude." *Stajic*, 214 F. Supp. 3d at 235 (quotation marks and citation omitted).

First, the Court finds Defendants' argument that the de-designation was motivated by *The*

*Reporter*'s ineligibility under § 214, and not retaliation, to be unpersuasive.  Again, Defendants argue that § 214 mandated *The Reporter*'s de-designation because the newspaper published unfavorable stories and "misinformation" about County officials.  Dkt. 42-2 at 21.  Defendants contend that such coverage violated the law's requirement that the official newspaper for publishing local laws and notices "support the nominees or office holders of th[e] party" in power. *Id.* at 20.  However, Defendants' interpretation of the eligibility requirements under § 214 is simply inaccurate in relation to the contemporary version of § 214.  As discussed above, under § 214(2), each county's board of supervisors "shall designate at least two newspapers published within the county as official newspapers for the publication of all local laws, notices and other matters required by law to be published."  In assigning the designation, the law instructs counties to consider, in part, "those newspapers advocating the principles of the two major political parties[.]" However, § 214(2) makes explicit that "the fact that a newspaper is an independent newspaper not advocating the principles of any political party shall not disqualify it from consideration."  Thus, the plain language of the law in question makes clear that *The Reporter* did not remove itself from eligibility under the statute through its reporting.  Though a newspaper's political alignment is a required consideration under the statute, the law's plain text establishes that a newspaper's political independence does not disqualify a newspaper from designation.[6]  Moreover, the plain language of the law requires the County to additionally consider newspapers' "general circulation throughout the county" in making its designation decision.  § 214(2).  The Complaint specifically alleges that the County has two newspapers with county-wide reach: *The Reporter* and *The*

---

[6] As pointed out by Plaintiff, each of the cases cited by Defendants in support of this argument predate the 1973 amendment to § 214, which ensures that politically independent newspapers are eligible.  *See* Dkt. No. 42-2 at 20-22 (citing *Burns v. Joyce*, 228 N.Y.S.2d 532 (Sup. Ct. Albany Cnty. 1962); *Relihan v. Brink*, 285 A.D. 729 (3d Dep't 1955); *People ex rel. Bonheur v. Christ*, 208 N.Y. 6 (1916); *People ex rel. Guernsey*, 130 N.Y.S. 761 (Sup. Ct., Oneida Cnty. 1911)).

*Mountain Eagle*.  Dkt. No. 1 at ¶ 85.  The Complaint also alleges that the County has conceded that the paper which replaced *The Reporter*, *The Hancock Herald*, has a smaller circulation than *The Reporter*.  *Id.* at ¶ 51.  Therefore, not only was *The Reporter* qualified for designation, but other mandatory considerations also suggest that it may have been favored for designation.  Given these considerations, the Court finds that the de-designation was, at best for Defendants, an exercise of the County's discretion, not a required act under the statute.  Thus, the statute's references to a newspaper's political affiliation does not undermine Plaintiff's contention that the de-designation was motivated by retaliation in violation of the First Amendment.  Here, as discussed below, there are specific factual allegations that support that contention.

Second, Defendants' argument regarding temporal proximity both ignores the specific factual allegations directly suggesting retaliatory motive, which are supported by the Letter and the County's other communications with *The Reporter* and its owners attached to the Complaint, and misapplies the temporal proximity doctrine.  Temporal proximity is not required because the Complaint adequately alleges direct evidence of a retaliatory motive.  Defendants admit in writing that "the manner in which [*The Reporter*] . . . reports county business was one of the reasons the Board of Supervisors opted to change the official county paper to the *Hancock Herald* in 2022."  Dkt. No. 1-7.  Moreover, just a day after the de-designation, the chair of the Board explicitly stated that *The Reporter*'s Editor was a reason for the de-designation.  Dkt. No. 1-5.  Therefore, Plaintiff does not rely on allegations of circumstantial facts alone; the County's own statements, at the very least, "may be viewed as directly reflecting the alleged retaliatory attitude."  *Stajic*, 214 F. Supp. 3d at 235 (quotation marks and citation omitted).  Even if Plaintiff did rely on temporal proximity alone, the proximity of the alleged protected speech—the March 2022 article regarding the removal of a judge—and the de-designation within the same month in fact supports a finding of

causation at this stage. *See Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) ("six weeks fits comfortably within any line [the Second Circuit] might draw."). Confusingly, rather than focus on the proximity between the alleged protected speech and the adverse action, Defendants instead focus on the length of time between the de-designation and the March 2023 Letter in which the County admits that *The Reporter*'s coverage contributed to its de-designation. Dkt. No. 42-2 at 24. What matters for the use of temporal proximity to establish causation is the length of time between the protected speech and the alleged adverse action. *See, e.g., Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[.]"). Here, the only reasonable reading of the Complaint establishes that the alleged adverse action is the de-designation, not the March 2023 Letter explaining the de-designation. The year-long period between the March 2022 de-designation and the March 2023 Letter, if relevant at all, merely relates to the weight afforded to the Letter's evidentiary value, not whether the Complaint sufficiently alleges causation.

Third, as to Defendants' *Mount Healthy* defense, it is simply too soon for this Court to determine whether *The Reporter* faced de-designation regardless of its coverage of the County due to rising costs and changes in the method of posting notices. *See Mount Healthy*, 429 U.S. 274. "A *Mount Healthy* defense—that a defendant would have taken the same adverse action in the absence of the protected speech—is highly fact-intensive." *Severin v. New York City Dep't Educ.*, 1:19-cv-00775-MKV-RWL, 2021 WL 1226995, at *8 (S.D.N.Y. Mar. 31, 2021) (citing *Sher v. Coughlin*, 739 F.2d 77, 82 (2d Cir. 1984) and *Sheppard v. Beerman*, 18 F.3d 147, 151 (2d Cir. 1994)). As such, courts in this Circuit have found that dismissal of a First Amendment retaliation claim based on a *Mount Healthy* defense is generally not appropriate at the pleading stage. *Id.*

20

(listing cases).  In fact, Defendants cite no cases dismissing claims (or granting a motion for judgment on the pleadings based on the same standard) due to a *Mount Healthy* defense. Regardless, even at the summary judgment stage, that Defendants can point to other reasons for the de-designation decision does not automatically shield them from liability.  "[A] plaintiff can prove First Amendment retaliation even if the measures taken by the state were otherwise justified." *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006) (listing cases).  Plaintiff "need only establish that the protected activity was a substantial or motivating factor for the adverse employment action[,]" not that it was the only factor.  *Dillon v. Suffolk Cnty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 215 (E.D.N.Y. 2013).

Therefore, the Court will not grant judgment on the pleadings based on Defendants' arguments with respect to causal connection and the *Mount Healthy* defense.

### 2.  Directive on Communications

Beyond the de-designation, the Complaint may also be read to assert a First Amendment retaliation claim based on the County's implementation of a "gag directive" against *The Reporter*.[7] Again, after the de-designation and at the time of the alleged directive, *The Reporter* was no longer an independent contractor because it no longer published the County's notices.  Instead, to allege

---

[7] In contrast to Count One (addressing the de-designation), Count Two of the Complaint (addressing the directive) does not explicitly reference retaliation, but the parties' briefing appears to construe Count Two as asserting a First Amendment retaliation claim, at least in part.  *See, e.g.,* Dkt. No. 56 at 13 (including discussion of the gag directive under the heading, "The Complaint Plausibly Alleges First Amendment Retaliation"); *see also id.* at 18-19 (discussing the national news which allegedly prompted the directive in relation to the requirement to plead protected speech for a retaliation claim); *id.* at 32 ("Plaintiff's claim of First Amendment retaliation stems from the creation of the gag order itself . . .").  Therefore, the Court assesses whether Plaintiff's allegations related to the directive are sufficient to establish a First Amendment retaliation claim. The Court will separately assess whether the alleged directive itself, as a County policy, constitutes an impermissible prior restraint in violation of *The Reporter*'s First Amendment right to receive speech.

a First Amendment retaliation claim as a private actor criticizing a public official's conduct, Plaintiff must assert "(1) [it] has a right protected by the First Amendment; (2) the [Defendants'] actions were motivated or substantially caused by [Plaintiff's] exercise of that right; and (3) the [Defendants'] actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013); *A.S. v. City Sch. Dist. of Albany*, 585 F. Supp. 3d 246, 269 (N.D.N.Y. 2022). The Court finds that the Complaint adequately alleges a retaliation claim based on the directive.

### i. Protected Speech

First, the Court must assess whether the speech which allegedly led to the County's directive was protected speech. Drawing all reasonable inferences from the Complaint, the County imposed the alleged "gag directive" as retaliation for *The Reporter*'s co-owners speaking to *The New York Times* about the de-designation. Dkt. No. 1 at ¶¶ 74-76.[8] Thus, the Court must determine whether *The Reporter* and Plaintiff's speech about the de-designation was protected under the First Amendment.

Despite the newspaper's clear private interest in reinstating the County designation, the Court finds that the matter is an issue of public concern worthy of First Amendment protection. "[S]peech on matters of public concern is at the heart of First Amendment protection[,]" regardless of whether that protection is applied to a public employee or private citizen. *Rupp v. Buffalo*, 91 F.4th 623, 635 (2d Cir. 2024) (internal quotation marks omitted) (alteration in original). However, "private citizens enjoy a more absolute freedom of speech than that of public employees[.]" *Doe*

---

[8] Though the Complaint most clearly connects the alleged directive to the publishing of *The New York Times* story, to the extent that Plaintiff alleges that the directive was imposed in retaliation for continued unfavorable coverage of the County in *The Reporter*, as opposed to or in conjunction with Plaintiff's decision to speak to a national news organization, the Court finds the alleged continued unfavorable coverage to be protected speech for the same reasons discussed above. Supra Section IV(A)(1)(i).

*v. City of New York*, 18-cv-670 (ARR) (JO), 2020 WL 108265, at *12 (E.D.N.Y. Jan. 9, 2020). Thus, that *The Reporter* was no longer a public contractor for the purpose of publishing notices at the time of the alleged directive weighs in favor of First Amendment protection. Moreover, the nature of the disputed designation necessarily involves the public's access to information, a public concern of the highest order. *See, e.g., Patrick v. Apple*, 9:20-CV-0047 (LEK/DJS), 2020 WL 4816015, at *7 (N.D.N.Y. Aug. 19, 2020) (finding that the public has an important interest in "access to information about official misconduct"). Finally, the communications with the *New York Times* are not the expression of mere dissatisfaction with a soured relationship with the County, but instead, were clearly designed to bring awareness to alleged government misconduct. *See Burkybile*, 411 F.3d at 313 ("[p]ublic accusations of improper governmental actions are clearly matters of public concern, regardless of whether the accuser is motivated by personal reasons."); *see also See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs."). Therefore, the Court finds that the Complaint plausibly alleges that *The Reporter* was engaged in protected speech in relation to *The New York Times* story which allegedly prompted the "gag directive."

### ii. Improper Motivation

Next, Plaintiff must allege that the County implemented the alleged directive in retaliation for *The Reporter*'s participation in the *New York Times* story and the national media attention. Recognizing that a defendant's motive and intent are difficult to plead with specificity, courts in this Circuit find that "it is sufficient to allege facts from which a retaliatory intent reasonably may be inferred." *Gagliard v. Village of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994); *see also Case v. City of New York*, 233 F. Supp. 3d 372, 390 (S.D.N.Y. 2017) (applying the same standard). Plaintiff

has met this low bar.  Though Plaintiff does not have the same direct evidence of intent available to support the gag directive allegations as it does the de-designation allegations, Plaintiff has properly alleged circumstantial facts sufficient to avoid dismissal.  Crucially, the Complaint alleges that the County implemented the directive only five days after the de-designation became national news through the *New York Times* story, a proximity which strongly suggests a retaliatory motive. Dkt. No. 1.  Moreover, that the County did cite *The Reporter*'s coverage as a reason for the de-designation at least raises the inference of retaliatory animus in relation to the implementation of the directive.

Defendants contend that the directive was implemented to protect against litigation risk, not in retaliation for the national coverage of the de-designation.  Dkt. No. 42-2 at 19.  Indeed, "if taken for both proper and improper reasons, [Defendants' conduct] may be upheld if the [conduct] would have been taken based on the proper reasons alone."  *Graham v. Henderson*, 89 F.3d 75, 79 (2d. Cir 1996) (citing *Sher. v. Coughlin*, 739 F.2d 77, 82 (2d Cir. 1984)).  However, based on the Complaint and its supporting documents, the Court is unable to determine whether and to what extent litigation risk existed both prior to and after the publication of the *New York Times* story.  At this preliminary stage and reading the allegations in the light most favorable to Plaintiff, the Court is satisfied that the Complaint plausibly alleges improper motive for the directive.

### iii.  Harm and Chilling Effect

Finally, Plaintiff must allege "some injury" relating to the directive.  *Dorsett*, 732 F.3d at 160.  The Second Circuit has noted that, in claims alleging retaliation by a private citizen, "[it] ha[s] sometimes given the impression that silencing of the plaintiff's speech is the only injury sufficient to give a First Amendment plaintiff standing."  *Id.*  "Chilled speech is not the *sine qua non* of a First Amendment claim.  A plaintiff has standing if he can show either that his speech has

been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Id.* (emphasis omitted) (citing cases). Thus, in relation to the County's directive, Plaintiff need not show that its speech was chilled, only that the directive constituted a sufficient harm.[9]

The Court finds that Plaintiff has plausibly alleged a concrete harm resulting from the County's directive. Defendants correctly point out that there are no allegations that the County's directive permanently barred *the Reporter*'s communications with County employees, only that County employees were required to run requests by their superiors and the County Attorney's office. Dkt. No. 42-2 at 19, 27-28. But at this stage, the Court finds that Plaintiff has adequately alleged that the directive "immediately end[ed]" *The Reporter*'s "First Amendment newsgathering activity" in relation to the allegations involving Mr. Ermeti, and thus, chilled its speech. *McKenna v. Nassau County*, 2:23-CV-4286 (ARR) (ST), 2023 WL 8455670, at *11 (E.D.N.Y. Dec. 6, 2023). Moreover, even absent a chilling effect on *The Reporter*'s First Amendment rights, the directive is at least analogous to harms which the Second Circuit has found sufficient for purposes of a First Amendment retaliation claim. *See Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (finding additional scrutiny at a border crossing was a sufficient harm). Indeed, other courts in this circuit have noted that *Dorsett* and the cases applying it might require no more than the concrete injury sufficient to confer Article III standing for First Amendment retaliation claims raised by private citizens. *See Doe*, 2018 WL 3824133, at *13 (suggesting that "the Second Circuit now requires private citizens raising First Amendment claims to show only a concrete harm sufficient to

---

[9] For separate reasons, despite Defendants' contentions, Plaintiff also need not demonstrate a chilling effect for its retaliation claim relating to the de-designation. *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004) ("it is well-settled that public employees "alleging retaliation for engaging in protected speech are not normally required to demonstrate a chill subsequent to the adverse action taken against them."). In that context, as discussed above, an adverse employment action such as discharge is sufficient.

constitute an 'injury in fact' sufficient for standing."). Drawing all reasonable inferences, the Complaint alleges that the directive caused delays in *The Reporter*'s newsgathering activities, which presumably hindered its business and thus constitutes a concrete injury sufficient for standing. Further, the standard for an adverse action which requires "conduct that would deter a similarly situated individual [. . . .] from exercising his or her constitutional rights" weighs in favor of finding that Plaintiff has adequately alleged a harm in relation to the directive. *Zelnik*, 464 F.3d at 225 (citation omitted); *McKenna*, 2023 WL 8455670, at *9 (applying the same standard to a reporter bringing a retaliation claim as a private citizen). It is plausible that other local newspapers would be deterred from participating in similar unfavorable coverage of the County out of fear that a similar directive would complicate and hinder their reporting on County activities.

### B. Prior Restraint Claim

Aside from alleging retaliation, Plaintiff also challenges the constitutional viability of the County's directive as a prior restraint on County employees which limited *The Reporter*'s right to receive information. "It is well established that '[i]ndividuals do not relinquish their First Amendment rights by accepting employment with the government.'" *Latino Officers Ass'n., New York, Inc., v. City of New York*, 196 F.3d 458, 462-63 (2d Cir. 1999) (quoting *Harman v. City of New York*, 140 F.3d 111, 117 (2d Cir.1998)). However, given the government's particular interest in regulating the speech of its employees, the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *See United States v. National Treasury Employees Union*, 513 U.S. 454, 465 (1995) ("*NTEU*"). Despite the government's relatively greater latitude in restricting the speech of its employees, the government is subject to a higher standard in justifying its restrictions where the restriction is a

prior restraint.  *See NTEU*, 513 U.S. at 459.

A prior restraint is an action "forbidding certain communications when issued in advance of the time that such communications are to occur." *Perry v. McDonald*, 280 F.3d 159, 171 (2d Cir. 2001) (citation omitted).  Where prior restraints are imposed on the speech of public employees, "[t]he government has a high burden" which requires it to "show that the interests of both potential audiences and a vast group of present and future employees . . . are outweighed by that expression's necessary impact on the actual operation of the Government." *NTEU*, 513 U.S. at 468 (1995) (internal quotation marks and citations omitted).  Additionally, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (*citing Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)).

Though in most cases, challenges to prior restraints are brought by the public employees whose speech is directly restrained, "potential receivers of otherwise restrained speech" have standing to challenge restraints on speech so long as there are "willing speakers." *See Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 607–08 (2d Cir. 1988); *see also Pen American Center, Inc. v. Trump*, 448 F. Supp. 3d 309, 323 (S.D.N.Y. 2020) ("An organization's right to receive information is impaired when it is unable to hear from a speaker who is willing to speak, but who has been obstructed by government action.").  Plaintiff must plead the existence of a willing speaker; the Court may not "infer the existence of a willing speaker from the mere existence of the communications protocol[.]" *Price v. Saugerties Central Sch. Dist.*, 305 Fed. Appx. 715, 716 (2d Cir. 2009).  Such recipient claims are "entirely derivative" of the rights of the public employee subject to the challenged regulation.  *Spargo v. N.Y State Comm'n on Judicial Conduct*, 351 F.3d 65, 83-84 (2d Cir. 2003). The Court finds that the Complaint plausibly alleges that the directive

constitutes an impermissible and unconstitutional prior restraint on the speech of the County's employees and that Plaintiff has standing to sue over that restraint based on its right to receive information.

First, the Court notes that the directive is undoubtedly a prior restraint which restricts speech before it occurs. *See Harman*, 140 F.3d at 115 (finding a policy which "forbid[s] employees from speaking with the media regarding any policies or activities of the agency without first obtaining permission from the agency's media relations department" to be a prior restraint).[10] Thus, to properly assert a claim based on its right to receive information, Plaintiff must allege the existence of a willing speaker to establish standing and facts sufficient to plausibly suggest the government's restriction fails under the test explained in *NTEU*.

At this stage, Plaintiff's allegations are sufficient to establish the existence of a willing speaker. The Complaint details *The Reporter*'s communications with Mr. Ermeti, public defender

---

[10] To the extent that the Complaint also asserts a First Amendment equal access claim, the Court finds that the claim survives dismissal. The Complaint references the media's First Amendment right to "equal access to news sources on equal terms and conditions, without disfavored treatment or exclusion by the government." Dkt. No. 1 at 21. However, this reference is included under the cause of action for Plaintiff's right to access information from willing speakers, and thus, it is unclear whether Plaintiff intends to separately assert its equal access rights. *Id.* Moreover, Plaintiff only briefly mentions the right to equal access of the media in its brief, and there, Plaintiff more directly references such a right under the Fourteenth Amendment rather than the First Amendment. Dkt. No. 56 at 32. For their part, Defendants spend a large portion of their briefs arguing that "[t]he right to equal access to information by the media is not absolute[,]" and that because the County's restriction is "content neutral" and achieves a legitimate government interest, it is permissible. Dkt. No. 57 at 8; Dkt. No. 42-2 at 29-30. Broadly, the government's exclusion of a single media outlet from newsworthy information is permissible where the restriction is content-neutral, where the restriction serves a legitimate purpose, and where the benefits of the restriction outweigh the benefits that would result from lifting the restriction. *See McKenna*, 2023 WL 8455670, at *3 (citing *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 260 (S.D.N.Y. 2019)). Here, the Court has already found that the Complaint plausibly alleges that the County was motivated by retaliation in issuing the directive, and thus, the Court finds that the alleged directive is a content-based restriction. *McKenna*, 2023 WL 8455670, at *6 ("[a] restriction issued in retaliation for critical speech can qualify as a content-based . . . restriction").

for the County, in relation to a story about the County's Public Defender Facebook page and alleges that Mr. Ermeti, at first, refused to respond to *The Reporter* without referring the communication to the County Attorney's Office.  Dkt. No. 1 at ¶ 77.  Defendants argue these allegations are insufficient because the directive Mr. Ermeti was following was put in place to protect the County from litigation, not to restrict information.  Dkt. No. 42-2 at 27.  But the purpose of the directive is relevant to whether the directive survives scrutiny under *NTEU*, not the existence of a willing speaker.  Defendants also point out that Mr. Ermeti did eventually respond to a separate inquiry.  *Id.* at 28.  But a closer look at the allegations in the Complaint reveals that he did so only after obtaining approval from other County officials, providing further support for the notion that he was a willing speaker restrained by the existence of the gag directive, a prior restraint.  Dkt. No. 1 at ¶¶ 82-83.[11]

Finally, Defendants argue that Mr. Ermeti's requested speech was relevant to his job duties, and therefore, he was not speaking as a citizen for First Amendment purposes.  *See* Dkt. No. 42-2 at 19 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).  Because Plaintiff's standing is derived from the existence Mr. Ermeti's First Amendment rights, such a finding would undermine their claim.  But it is unclear whether the speech at issue—Mr. Ermeti's response to *The Reporter*'s inquiry—was "made pursuant to his duties[.]"  *Garcetti*, 547 U.S. at 421.  In contrast to the employee in *Garcetti*, it is unclear whether Mr. Ermeti's speech is related to his "daily professional activities" or "work product[.]".  *Id.* at 42.  Defendants assert that because the speech at issue implicated "aspects of [his] job duties," and Mr. Ermeti's "knowledge of who administers a

---

[11] Defendants also point out that another County employee, Wayne Marshfield, was able to speak to *The New York Times* about the de-designation, and thus, no directive against such communications could have been in place.  Dkt. No. 42-2 at 18.  But Plaintiff's claim is based on an alleged directive that was implemented after *The New York Times* article was published.  Dkt. No. 1 at ¶ 76.

Facebook page for the County," the speech is not protected.  Dkt. No. 42-2 at 19.  However, that

the speech touched upon issues that are related to his work does not demand dismissal.  *See*

*Schoolcraft v. City of New York*, 10 Civ. No. 6005(RWS), 2012 WL 2161596, at *5 (S.D.N.Y.

June 14, 2022) ("The fact that a plaintiff's speech is related to his or her job does not automatically

result in a loss of First Amendment protection.").  In fact, several issues weigh in favor of assuming

First Amendment protection, at least at this stage.  First, that Mr. Ermeti spoke on information

which was not generally available to the public supports a finding of First Amendment protection.

*See Griffin v. City of New York*, 880 F. Supp. 2d 384, 400 (E.D.N.Y. 2012) (finding public

employee's speech was made as a private citizen).  "Were [public employees] not able to speak on

[the operation of their employers], the community would be deprived of informed opinions on

important public issues."  *Id.* (citations omitted).  Second, courts in this Circuit have looked to

whether the identified speech was "internal speech," such that it never left the confines of the

public employee's workplace, or whether it reached the public or the press as an indicator for

determining whether the speech is protected.  *Schoolcraft*, 2012 WL 2161596, at *8.  Here, such a

distinction favors treating Mr. Ermeti's speech as that of a private citizen, not as speech made

pursuant to his official duties.  Third, and most importantly, there are no allegations pertaining to

Mr. Ermeti's official duties as a public defender, and therefore, this Court cannot determine

whether his speech implicated those duties.  *See Brown v. Office of State Comptroller*,  211 F.

Supp. 3d 455, 465 (D. Conn. 2016) ("Prior to summary judgment, courts are often unable to

determine whether an employee's speech is pursuant to her 'official duties.'") (citations omitted);

*see also Hagan v. City of New York*, 39 F. Supp. 3d 481, 513 (S.D.N.Y. 2014) (refusing to dismiss

where "development of the record" would allow the court to assess official duties).  At this stage,

the Court finds that the Complaint plausibly alleges that Mr. Ermeti is a willing speaker whose

30

speech is subject to First Amendment protection, and dismissal of the claim is inappropriate.

Moreover, the Court finds that the alleged restrictions on the flow of information from the County were impermissible under the balancing test established by *NTEU*. Defendants argue that even if there are willing speakers, the County's alleged restriction on communications with *The Reporter* was justified due to the risk of litigation. Dkt. No. 42-2 at 29. But pursuant to *NTEU*, the government carries a "high burden" and must demonstrate "that the interests of both potential audiences and a vast group of present and future employees . . . are outweighed by that expression's necessary impact on the actual operation of the Government." *NTEU*, 513 U.S. at 468 (1995). Therefore, this Court must balance the County's interest in avoiding litigation risk with the interests of the public and the County employees.

The Court acknowledges, in light of the present case, that the risk of litigation against the County is a "real, not merely conjectural" harm. *NTEU*, 513 U.S. at 475. However, the County has failed to show that the alleged directive was designed to address the asserted harm in a "direct and material way." *Id.* The alleged directive is overbroad and reaches all communications with *The Reporter*, not just communications pertaining to the de-designation, the subject of potential litigation. On the other side of the NTEU balancing test, County employees' ability to speak with *The Reporter* as part of the newspaper's newsgathering undoubtedly implicates public concerns. *See Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007) ("public concern is something that is a subject of legitimate news interest[.]"). Indeed, as alleged, the directive "imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said." *NTEU*, 513 U.S. at 470. The Supreme Court has noted that "[g]overnment employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions." *Waters v. Churchill*, 511 U.S. 661, 674 (1994).

Therefore, it is clear that the "potential audience[]" for the restrained speech, the public, has a significant interest in the County employee's ability to speak to *The Reporter* regarding the County's governance. Moreover, though the alleged directive leaves open the possibility that public employees may ultimately be able to speak with *The Reporter* after obtaining approval, the directive nevertheless "directly regulate[s] speech" and therefore poses a significant burden on the public's interest. *Harman*, 140 F.3d at 119. Additionally, "the prior approval mechanism allows [the County] to control the timing of the intended speech[,]" which grants the County "the power to destroy the immediacy of the comment on [County] affairs, and thus, in many cases, its newsworthiness." *Id.* at 120. In light of these great interests, the Court finds that the Complaint has plausibly alleged that the directive violates the First Amendment as an impermissible prior restraint.[12]

### C. Equal Protection Claim

Finally, the Court dismisses Plaintiff's Equal Protection claim. "Courts in the Second Circuit have dismissed equal-protection claims that merely restate First Amendment retaliation claims." *Best Payphones, Inc. v. Dobrin*, 410 F. Supp. 3d 457, 484 (E.D.N.Y. 2019) (listing cases); *see also Salvana v. New York State Dep't of Corrections and Comm. Supervision*, 621 F. Supp. 3d 287, 313 (N.D.N.Y. 2022). Here, Plaintiff argues that Defendants' alleged directive barring its employees from directly speaking to *The Reporter*, but permitting its employees to speak to other

---

[12] The Court also rejects Defendants' argument that Plaintiff failed to plead the personal involvement of Defendant Merklen. Drawing all reasonable inferences from the Complaint, Defendant Merklen is alleged to have implemented the directive itself on behalf of the County Attorney's Office. *See* Dkt. No. 1 at ¶¶ 76-83. Indeed, Defendants acknowledge this fact. *See* Dkt. No. 42-2 at 36 ("Defendant Merklen is colloquially said to have issued a 'gag order' on behalf of the County[.]"). Defendants' sole argument on this point is that the alleged directive does not constitute a true gag order, but the Court has already determined that the allegations are sufficient to state a claim of retaliation, as well as a claim for violation of *The Reporter*'s right to receive information from willing speakers.

members of the media, violates their right to equal protection.  Dkt. No. 1 at 21.  Plaintiff attempts

to distinguish its equal protection claim from its retaliation claim by emphasizing that the equal

protection claim "is not based just on the fact of the gag order itself, but also on the presumption

that other newspapers in the area were free to communicate with County officials in their

newsgathering endeavors."  Dkt. No. 56 at 32.  But "[a]n equal protection claim merely restates a

First Amendment retaliation claim when the only basis for alleged differential treatment is the

same protected First Amendment activity on which the retaliation claim rests."  *Loc. 3599, NYC*

*Dep't of Env't Prot. Tech. Pro. Emps. v. City of New York*, No. 23-CV-1035, 2024 WL 966077, at

*12 (S.D.N.Y. Mar. 6, 2024).  Here, the basis for the alleged differential treatment and the

protected activity relevant to the retaliation claim is identical: Plaintiff's reporting and

participation in *The New York Times* coverage surrounding the County's de-designation of *The*

*Reporter*.  Indeed, Plaintiff's retaliation and equal protection claims based on the directive are

asserted together in Count Two.  Dkt. No. 1 at 21.  Therefore, the Court finds that the equal

protection claim is duplicative and must be dismissed.

### D.  Legislative Immunity

Defendants attempt to avoid liability for the Board Members, except Chair Molé, by

invoking legislative immunity, but the Court finds that immunity does not apply to the vote to de-

designate *The Reporter*.  While "[t]he act of voting is quintessentially legislative . . . . hiring or

firing a particular employee does not have effects that reach beyond that particular employee . . .

[and] is an administrative personnel matter that involves no policy formulation."  *Zdziebloski v.*

*Town of East Greenbush, N.Y.*, 336 F. Supp. 2d 194, 203 (N.D.N.Y. 2004) (internal quotation

marks and citation omitted); *see also Bierce v. Town of Fishkill*, 656 F. App'x 550, 554 (2d Cir.

2016) (finding that a vote to eliminate two positions from the police department was not entitled

to legislative immunity even where the legislators cited budgetary concerns).  Therefore, such acts do not trigger legislative immunity, even when such actions are taken by a vote of legislators.  *Id*; *see also Visser v. Magnarelli*, 542 F. Supp. 1331, 1333-34 (N.D.N.Y. 1982).

Here, the de-designation of *The Reporter* was not the kind of "discretionary, policymaking decision implicating the budgetary priorities of the city" which could qualify for immunity.  *Id.* (citation omitted).  Instead, § 214 requires that the County designate a newspaper of record and imposes permissible considerations on that decision, limiting the legislators' discretion.  Moreover, the decision directly impacts *The Reporter* alone.  Finally, the de-designation decision is analogous to the decision to fire, or not rehire, an employee, which this Court has repeatedly recognized as outside the scope of legislative immunity.  *Almonte v. City of Long Beach*, 478 F.3d 100, 107-08 (2d Cir. 2007); *McNamara v. Cnty. of Saratoga*, 1:21-cv-1312 (BKS/DJS), 2024 WL 4189389, at *21 (N.D.N.Y. Sep. 12, 2024); *Rubeor v. Town of Wright*, 191 F. Supp. 3d 198, 204 (N.D.N.Y. 2016);[13] *see Zdziebloski*, 336 F. Supp. 2d at 203.  Indeed, at least one court in this Circuit has found that a "vote to cancel [a plaintiff's] contract as an outside contractor . . . was not a policy decision or substantively legislative" for purposes of legislative immunity, and therefore, "the cancelling of [the] contract was akin to a discretionary personnel decision, for which legislators are not entitled to immunity."  *Grasson v. Board of Educ. of Town of Orange*, 3:09CV1584 (PCD), 2010 WL 1444570, at *5 (D. Conn. Apr. 12, 2010).  This Court follows suit.

## E.  Article 78

Defendants also attempt to evade liability for the de-designation decision by invoking the

---

[13] Plaintiff also asserts that the Board Members' decision to sign to the March 2023 Letter voicing their displeasure over *The Reporter*'s coverage is not entitled to legislative immunity.  The Court agrees, but the March 2023 Letter serves merely to illustrate the County's allegedly retaliatory motive in relation to the de-designation decision; alone, it does not stand as the basis for any of Plaintiff's claims.

availability of state remedies through CPLR § 7801 ("Article 78"), but the Court is unpersuaded. Though Defendants successfully identify cases involving challenges to designation decisions through Article 78, Defendants provide no support for the notion that Plaintiff was required to assert such a claim prior to bringing the instant Section 1983 action.  Indeed, none of Defendants' cases involve constitutional claims.  Instead, the plaintiffs in those cases merely challenged the relevant designation decisions based on their compliance with § 214.  *See Myers-Brooks Pub. Co. v. Bd. of Sup'rs of Fulton Cnty.*, 68 Misc. 2d 1033, 1033-34 (Sup. Ct., Fulton Cnty. 1972); *News-Rev. Pub. Corp. v. Lomenzo*, 53 Misc. 2d 370, 371–72 (Sup. Ct., Suffolk Cnty.), *aff'd*, 28 A.D.2d 823 (1967).  Nor do any of these cases impose a requirement that all claims based on designation decisions be brought pursuant to Article 78.  In fact, "exhaustion of state remedies 'is not a prerequisite to an action under § 1983[.]'"  *Heck v. Humphrey*, 512 U.S. 477, 480 (1994) (quoting *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 501 (1982)).  Without the identification of any authority for the proposition that Plaintiff was required to bring an Article 78 case prior to the instant action, and in light of authority at least suggesting the opposite, the Court finds that Defendants' exhaustion argument is insufficient to warrant judgment on the pleadings.

### F.  Official Capacity Claims

Finally, the Court finds that the official capacity claims against the individual Defendants are mere duplications of the claims against the County itself and must therefore be dismissed. Plaintiff asserts claims against the individual Defendants both in their individual and official capacities.  *See* Dkt. No. 1 at 1.  However, Plaintiff also asserts the same claims against the County itself.  *Id.* at 20-21.  "Courts within the Second Circuit regularly dismiss with prejudice official-capacity claims against a public official when the claims are duplicative of the claims against the governmental entity for which the official works."  *Sonnick v. Budlong*, 5:20-CV-410 (TJM/ML),

2020 WL 4345004, at *2 (N.D.N.Y. July 29, 2020) (listing cases). Plaintiff does not address this argument in its response. *See generally* Dkt. No. 56. As such, the official capacity claims are dismissed.

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' motion for a judgment on the pleadings, Dkt. No. 42, is **DENIED in part and GRANTED in part**; and the Court further

**ORDERS** that Plaintiff's Equal Protection claim is **DISMISSED**; and the Court further

**ORDERS** that Plaintiff's official capacity claims are **DISMISSED**; and the Court further

**ORDERS** that the motion for judgment on the pleadings is **DENIED** in relation to all other claims; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: February 24, 2025
      Albany, New York

                                        Anne M. Nardacci
                                        U.S. District Judge