UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

DECKER ADVERTISING INC.,

                    Plaintiff,

         v.                                            3:23-cv-01531 (AMN/ML)

DELAWARE COUNTY, NEW YORK; and TINA
MOLÉ; ARTHUR MERRILL; MARK TUTHILL;
THOMAS AXTELL; JEFFREY TAGGART;
WAYNE E. MARSHFIELD; JERRY VERNOLD;
JAMES E. EISEL; GEORGE HAYNES, JR.;
BETTY L. SCOTT; JAMES G. ELLIS; CARL
PATRICK DAVIS; ALLEN R. HINKLEY; ERIC T.
WILSON; JOHN S. KOSIER; WILLIAM
LAYTON; JOSEPH CETTA; and AMY
MERKLEN, *in their individual and official
capacities*,

                    Defendants.

---

**APPEARANCES:**                          **OF COUNSEL:**

**CORNELL LAW SCHOOL**                    **HEATHER E. MURRAY, ESQ.**
**FIRST AMENDMENT CLINIC**
Myron Taylor Hall
Ithaca, New York 14853
*Attorneys for Plaintiff*

**GREENBERG TRAURIG, LLP**               **MICHAEL J. GRYGIEL, ESQ.**
54 State Street – 6th Floor               **CYNTHIA E. NEIDL, ESQ.**
Albany, New York 12207                    **KELLY L. MCNAMEE, ESQ.**
*Attorneys for Plaintiff*                 **CHRISTINA N. HERNSDORF,**
                                          **ESQ.**

**HANCOCK ESTABROOK, LLP**               **FRANK W. MILLER, ESQ.**
1800 AXA Tower I                          **LINDSEY H. HAZELTON, ESQ.**
100 Madison Street
Syracuse, New York 13202
*Attorneys for Defendants*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

On December 4, 2023, plaintiff Decker Advertising Inc. ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 1983 ("§ 1983") against defendants Delaware County, New York ("County"), County Attorney Amy Merklen, and County Board of Supervisors members Tina Molé, Arthur Merrill, Mark Tuthill, Thomas Axtell, Jeffrey Taggart, Wayne E. Marshfield, Jerry Vernold, James E. Eisel, George Haynes, Jr., Betty L. Scott, James G. Ellis, Carl Patrick Davis, Allen R. Hinkley, Eric T. Wilson, John S. Kosier, William Layton, and Joseph Cetta (collectively "Defendants").  Dkt. No. 1 ("Complaint").  Presently before the Court are partial motions for summary judgment from Defendants and from Plaintiff.  Dkt. Nos. 245, 246 (each, a "Motion"); *see also* Dkt. Nos. 252-255.  For the reasons that follow, the Court denies both Motions.

## II.    BACKGROUND[1]

### A.  The Parties

Plaintiff is a New York corporation that is owned by Kim and Randy Shepard.  Dkt. No. 252-1 at ¶ 1; Dkt. No. 253-1 at ¶ 5.  Plaintiff publishes *The Reporter*, a newspaper distributed in Delaware County and online.  Dkt. No. 252-1 at ¶ 2.  Lillian Browne is the editor of *The Reporter*.  Dkt. No. 253-1 at ¶ 6.

The Delaware County Board of Supervisors ("Board") is the legislative body for the County.  Dkt. No. 252-1 at ¶ 3.  The Board consists of the supervisors of the nineteen towns within

---

[1] Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response.  *See* N.D.N.Y. L.R. 56.1.  The Court has also considered the parties' other submissions and attached exhibits.

the County. *Id.* The supervisors are each elected solely as town officers at town elections, but serve as ex-officio County legislators. *Id.*

The following seventeen Defendants were members of the Board (collectively, the "Defendant Board Members") at all times relevant to the Complaint unless otherwise noted. Tina Molé was the Chairperson of the Board and the Town of Bovina Supervisor. *Id.* at ¶ 4. Arthur Merrill was the Town of Colchester Supervisor. *Id.* at ¶ 5. Until January 2024, Mark Tuthill was the Town of Delhi Supervisor. *Id.* at ¶ 6. Until January 2024, Thomas Axtell was the Town of Deposit Supervisor. *Id.* at ¶ 7. Until January 2024, Jeffrey Taggart was the Town of Franklin Supervisor. *Id.* at ¶ 8. Wayne E. Marshfield was the Town of Hamden Supervisor. *Id.* at ¶ 9. Jerry Vernold was the Town of Hancock Supervisor. *Id.* at ¶ 10. Until his resignation in February 2023, James E. Eisel, Sr. was the Town of Harpersfield Supervisor. *Id.* at ¶ 11. George Haynes, Jr., was the Town of Kortright Supervisor. *Id.* at ¶ 12. Betty L. Scott was the Town of Masonville Supervisor. *Id.* at ¶ 13. James G. Ellis was the Town of Meredith Supervisor. *Id.* at ¶ 14. Until January 2024, Carl Patrick Davis was the Town of Middletown Supervisor. *Id.* at ¶ 15. Allen R. Hinkley was the Town of Roxbury Supervisor. *Id.* at ¶ 16. Beginning in January 2022, Eric T. Wilson was the Town of Sidney Supervisor. *Id.* at ¶ 17. John S. Kosier was the Town of Stamford Supervisor. *Id.* at ¶ 18. William Layton was the Town of Tompkins Supervisor. *Id.* at ¶ 19. Joseph Cetta was the Town of Walton Supervisor. *Id.* at ¶ 20.

Finally, beginning in 2017, Amy Merklen served as the County Attorney but was not a member of the Board. *Id.* at ¶¶ 21, 34.

### B. Overview of Relevant Events

The Court previously detailed Plaintiff's factual allegations at length. *See generally Decker Advert., Inc. v. Delaware Cnty., N.Y.*, 765 F. Supp. 3d 128, 137-41 (N.D.N.Y. 2025).

Broadly, Plaintiff's First Amendment claims arise from (i) *The Reporter* losing its status as the County's official paper in March 2022; and (ii) an alleged directive to County employees in or about May 2023 that purportedly limited the ability of *The Reporter* to receive information. *See generally* Dkt. No. 1. The Court provides an overview of these events below, followed by the facts on which the parties' competing Motions rely.

New York County Law § 214(2) ("Section 214(2)") provides in pertinent part that "[t]he board of supervisors shall annually designate at least two newspapers published within the county as official newspapers for the publication of all local laws, notices and other matters required by law to be published." *Decker Advert.*, 765 F. Supp. 3d at 137 (alteration in original).

For years, since virtually its founding in 1881, *The Reporter* had been designated as the County's official paper. Dkt. No. 252-1 at ¶ 23; Dkt. No. 253-1 at ¶ 8. Pursuant to Section 214(2), the Board most recently designated *The Reporter* as the County's official paper in January 2022. Dkt. No. 252-1 at ¶ 26; Dkt. No. 253-1 at ¶ 9.

On or about March 2, 2022, *The Reporter* increased its fees to publish legal notices and implemented a new system for publishing these notices. Dkt. No. 252-1 at ¶¶ 28-29; Dkt. No. 253-1 at ¶¶ 14-15.

On March 9, 2022, *The Reporter* published an article regarding the removal of a town justice from his criminal court duties. Dkt. No. 253-1 at ¶ 19.

On March 15, 2022, the County Attorney's Office sent *The Reporter* a letter, signed by Defendant Merklen, which stated, *inter alia*, that:

> We are writing to demand that the Reporter immediately retract and correct the above referenced story, because it is overwhelmingly false, and defamatory to the Delaware County Board of Supervisors.
>
> Lil[l]ian Browne has a history of writing stories about Delaware County which are selectively researched, one-sided and ignore or minimize any facts incompatible

with her intended narrative.  She often uses sensationalism and exaggeration to play on the emotions, prejudices, and fears of her readers, undermining their confidence in our County government by disparaging its actions and casting its leaders in a materially false light.

. . . .

Delaware County demands that the Reporter immediately and prominently print and post a full retraction of Lil[l]ian Browne's story, and then submit a complete and accurate correction to the Delaware County Board of Supervisors, for its approval, prior to publication by the Reporter.  In addition, the County expects the Reporter to take every step necessary to remove its libelous story from the internet and ensure that it has [ ] fully de-indexed same from every available internet search engine (e.g., Google).

Dkt. No. 246-33 at 3-4;[2] *see also* Dkt. No. 1 at ¶ 35.

The Reporter issued a correction the same day, stating that "[a]n earlier version of this story incorrectly stated that Delhi Justice Gumo was removed from presiding over criminal cases by Delaware County's Legislative Committee.  Gumo was removed from presiding over criminal cases by New York's Sixth Judicial District Administrative Judge."  Dkt. No. 253-1 at ¶ 23 (alteration in original); *see also* Dkt. No. 1 at ¶ 37.

On March 23, 2022, eighteen of the Board's nineteen members voted to de-designate *The Reporter*.[3]  Dkt. No. 252-1 at ¶ 30; Dkt. No. 253-1 at ¶ 34; Dkt. No. 1 at ¶ 40.  As detailed below, the parties' dispute the reason(s) for the Board's action.  In place of *The Reporter*, the Board selected *The Hancock Herald* as the County's official paper.  Dkt. No. 252-1 at ¶ 31; Dkt. No. 253-1 at ¶ 34.  The *Hancock Herald* had and still has a lower circulation than *The Reporter*.  Dkt. No. 253-1 at ¶ 35.

---

[2] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

[3] Non-party Dennis J. Valente voted for de-designation along with the seventeen Board Member Defendants, but passed away prior to the commencement of this lawsuit.  Dkt. No. 1 at ¶ 40 & n.1.

Almost a year later, on March 8, 2023, the Board sent the owners of *The Reporter* a letter.

Dkt. No. 253-1 at ¶ 44.  The letter stated, *inter alia*, that:

> It is with great regret that this letter has become necessary.  As department heads and local leaders working in Delaware County we take great pride in our professionalism and dedication to provide the highest quality of services to residents of Delaware County. . . . Our staff works extremely hard each day and it is disheartening that the reporting in your paper does not truly reflect the hard work, integrity and professionalism that is deserved.
>
> . . . .
>
> Articles in the Reporter are written in an inflammatory manner; facts are either misrepresented or omitted from the stories; employee names, titles and scopes of work are incorrect and editorial remarks are made to put a negative light on the County government. . . . It appears to the signatories of this letter your paper has become a platform to undermine the County and the work that we do each and every day.
>
> This flagrant manipulation of facts and the manner in which your paper reports county business was one of the reasons the Board of Supervisors opted to change the official county paper to the Hancock Herald in 2022.  This action alone should have signaled to you a problem in the operations of your business and prompted an immediate change.  However, it appears it only prompted additional unfair and unethical reporting from your staff.
>
> The negative reporting and the misrepresentation of county business has caused several misunderstandings, distrust from the community and has created hours of wasted time correcting the damage your paper is causing.  We neither have the time or patience to continue to combat this unethical representation of our work.  We are asking that you look into this matter and make immediate changes as necessary in an effort to create a fair and ethical form of reporting on county business.

Dkt. No. 246-32 at 7-8; *see also* Dkt. No. 1 at ¶ 57.  Dozens of County officials signed the letter, including heads of various County departments and fifteen of the seventeen Defendant Board Members (i.e., Defendants Axtell, Cetta, Davis, Ellis, Haynes, Jr., Hinkley, Kosier, Layton, Marshfield, Merrill, Molé, Taggart, Tuthill, Vernold, and Wilson).  Dkt. No. 246-32 at 8-9; *see also* Dkt. No. 1 at ¶ 58.

In May 2023, several months after the letter, the County became aware that *The New York*

*Times* was preparing an article regarding the March 2022 de-designation.  Dkt. No. 252-1 at ¶ 50.

On May 15, 2023, following an inquiry from *The Reporter*, Defendant Merklen wrote to Defendant Molé that "[a]s a rule, individual departments should not be sending emails/responses to the press, just like [Freedom of Information Law ("FOIL")] requests."  Dkt. No. 255-1 at ¶ 85.

On May 16, 2023, following another inquiry from *The Reporter*, Defendant Merklen told Defendant Molé and the County's personnel director that "Department heads need to stop having conversations with Lillian [Browne]."  *Id.* at ¶ 86.

On May 17, 2023, Defendant Molé emailed the Clerk of the Board and requested that she "kindly send an email to all Department Heads that they should not be responding to any press inquiries . . . The requests should go to [Defendant Merklen] and . . . our Public Information Officer."  Dkt. No. 252-14 at 2 (first alteration in original); *see also* Dkt. No. 255-1 at ¶ 87.  Later that same day, the Clerk of the Board emailed the County department heads "a reminder to please not respond to any press inquiry.  Those requests should be directed to [Defendant Merklen] or to . . . our Public Information Officer."  Dkt. No. 252-1 at ¶ 51.

On May 18, 2023, Defendant Merklen advised the Board that *The Reporter* had retained counsel and, in anticipation of litigation, further advised them not to talk to any reporters or comment on issues related to the anticipated litigation.  *Id.* at ¶ 52.

Plaintiff contends that various County department heads responded to these events by changing their interactions with the press and/or seeking clarification regarding the directive.  Dkt. No. 255-1 at ¶¶ 88-90.

On June 18, 2023, *The New York Times* covered the County's de-designation of *The Reporter* in an article entitled "How Local Officials Seek Revenge on Their Hometown Newspaper."  Dkt. No. 252-1 at ¶ 55; *see also* Dkt. No. 1 at ¶ 74.  On June 22, 2023, *The Reporter*

7

emailed a County department head and asked "[w]ill you please tell me who authorizes, creates and does the posting on the Delaware County Public Defender Facebook account." Dkt. No. 252-9 at 3; *see also* Dkt. No. 255-1 at ¶ 91; Dkt. No. 1 at ¶ 77. On June 23, 2023, the County department head responded that "I have been directed to refer all inquiries in this matter and any other matter that pertains to the Public Defender's office to the County Attorney's office. Thank You." Dkt. No. 252-9 at 2; *see also* Dkt. No. 1 at ¶ 78.

To date, the County has not re-designated *The Reporter*. *See, e.g.,* Dkt. No. 1 at ¶ 101.

## C.  Additional Facts Relevant to Defendants' Motion

As an initial matter, only fourteen of the seventeen Defendant Board Members are moving for summary judgment (i.e., Defendants Axtell, Cetta, Davis, Eisel, Ellis,, Haynes, Jr., Hinkley, Kosier, Layton, Scott, Taggart, Tuthill, Vernold, and Wilson, collectively, the "Moving Supervisors"). *See, e.g.,* Dkt. No. 245-2 at 5.

Prior to 2022, the Board had continued to re-designate *The Reporter* "despite general knowledge of and dissatisfaction with the Reporter's inaccurate and misleading reporting[.]" Dkt. No. 252-1 at ¶ 24. In early 2022, in addition to *The Reporter*'s price increase for publishing legal notices, the new system implemented by the paper required County employees to arrange and create legal notices themselves on an online web application, and then upload the design and arrangement created by the County employee into a third-party system. *Id.* at ¶¶ 28-29.

The County Attorney's Office authored the March 15, 2022 letter that preceded the Board's vote to de-designate. *Id.* at ¶ 58. There is no evidence in the record that any of the Moving Supervisors drafted or provided input into the March 15, 2022 letter. *Id.* at ¶ 59.

On March 16, 2022, Defendant Molé sent a text message to Defendant Merklen stating: "I want to switch official papers." Dkt. No. 255-1 at ¶ 62. Defendant Merklen initially responded

"[o]k[,] [w]ill do" and subsequently responded that "[t]he articles in today's reporter are not that bad actually." *Id.* at ¶ 63.

On March 17, 2022, Defendant Molé sent an email to the Moving Supervisors and Defendant Merklen stating:

> I am sending a memo I asked [Defendant] Merklen to prepare for you. Every organizational meeting in January the Republicans[4] choose a newspaper and the Democrats choose a paper to designate as the official County newspaper.
>
> In addition to the doubling the cost of legal notices, The Reporter, continues to disparage and write non-factual articles about the County. This has gone on for several years.
>
> I am requesting that the County switch to the Hancock Herald as the Republican's choice for newspaper. They have subscribers all throughout Delaware County. If you all agree, I plan on having the County also place all of the County's legal notices on our website and FB pages. . . . . That is not currently being done.
>
> Would you please review [Defendant Merklen]'s memo and respond to me before our next meeting on Wednesday. If you agree, I will have an executive session to discuss with the full Board before we introduce a resolution. I don't wish to cause an issue but I believe the County deserves better than what the Reporter gives us.

Dkt. No. 246-26 at 2 (third alteration in original); *see also* Dkt. No. 255-1 at ¶ 64.

The memo referenced by Defendant Molé and prepared by Defendant Merklen states that:

> NYS County Law §214 governs the county's requirement to designate official newspapers. Each party designates a paper according to but not solely based upon their political beliefs. That statute requires that the paper be printed within the county, however, there are some exceptions that do not apply here. These two (2) papers shall carry the county's legal notices and local laws.
>
> There are three (3) steps to designation:
>     1. Each party much vote on a particular paper.
>     2. Once a paper is selected, the Clerk of the Board must certify that the paper, by majority vote, selected said paper.

---

[4] According to the parties, nearly all members of the Board in early 2022 were members of the Republican or Conservative political parties, or voted in caucus with the Republicans. Dkt. No. 252-1 at ¶ 25. At least one of Plaintiff's owners, Ms. Shepherd, is also identified as a member of the Delaware County Republican party in *The New York Times* article referenced above. Dkt. No. 1-15 at 5.

3. The COB must send the certified designation to the NYS Secretary of State no later than January 10th.

Caselaw has provided that once a designation is lawfully certified and filed with the Secretary of State, the designation can not be revoked. If a newspaper is illegally designated, the prior year's designation still stands as the designated paper.

Having said all of this, I feel we can revoke The Reporter's designation. When the official papers were designated, the clerk did not certify nor send the designation to the Secretary of State. Now, according to caselaw, the county's official paper would revert to the last designated paper, however, in our case, there is no[] such paper. At no point in recent memory, has the paper ever been certified and sent to the Secretary of State. Therefore, there is no prior lawfully designated paper to use.

Further, the price of using the Reporter as the official paper for legal notices has just about doubled. Comparing an ad placed last year to if the same ad was placed this year, shows that last year the ad cost approximately $20 to place and this year it is approximately $40. This does not include the increase in the affidavit fee.

Also, the county would not be stripping the Reporter of its livelihood. The county paid the Reporter less than $2,000 last year for legal ads.

Dkt. No. 246-34 at 2.[5]

Several Moving Supervisors responded to Defendant Molé's email and indicated that they agreed with switching newspapers. Dkt. No. 255-1 at ¶¶ 65, 69.

On March 23, 2022, there was an executive session meeting in which the Board discussed de-designation of *The Reporter*. *Id.* at ¶¶ 74, 78. At the subsequent Board meeting, the Moving Supervisors, Defendants Marshfield, Molé, and Merrill, and an eighteenth non-party Board member voted to de-designate *The Reporter*. *Id.* at ¶ 66; *see also supra* n.3. The resolution passed by the Board at that meeting stated, *inter alia*, that "the cost of placing a legal notice in The Reporter has doubled since the beginning of 2022, along with the amount of time it takes to successfully place the notices, affecting not only that Department's budget, but also the

---

[5] The Court notes that the parties do not dispute that, "[a]s a result of its official designation, The Reporter published on average 70 legal notices for Delaware County in 2020 and 2021, resulting in income in the amount of $14,544.74." Dkt. No. 253-1 at ¶ 10.

Department's workload." Dkt. No. 252-1 at ¶ 30; *see also* Dkt. No. 1 at ¶¶ 40-41.

There is no evidence in the record that any Defendant reached out to Plaintiff to complain about any fee increase or the switch to an automated system for placing legal notices. Dkt. No. 255-1 at ¶ 79. Members of the Board have also testified, *inter alia*, that "we no longer had The Reporter as our official paper" because "The Reporter had written, in an inflammatory manner, facts that were either misrepresented or omitted stories[,]" *id.* at ¶ 70; that the reasons for the de-designation of *The Reporter* included that "some are dissatisfied with the coverage of some of the articles," *id.* at ¶ 71; and that the County de-designated *The Reporter* because of "inaccurate reporting[,]" *id.* at ¶ 73.

Based on declarations submitted by the Moving Supervisors, Defendants contend that the Moving Supervisors voted to de-designate *The Reporter* due to increased costs and burden, and not because of any concerns regarding its coverage. Dkt. No. 252-1 at ¶¶ 32-33. In these declarations, each Moving Supervisor makes statements to the effect that he or she was generally aware of *other* Supervisors' concerns about *The Reporter*'s reporting prior to the paper's de-designation, but no Moving Supervisor states that he or she shared those concerns. Dkt. No. 245-3 at ¶ 6 (Defendant Axtell stating that he was "aware that other Supervisors may have had concerns regarding the factual accuracy of The Reporter's reporting"); Dkt. No. 245-5 at ¶ 6 (Defendant Davis stating the same); Dkt. No. 245-8 at ¶ 6 (Defendant Ellis stating the same); Dkt. No. 245-13 at ¶ 6 (Defendant Haynes, Jr., stating the same); Dkt. No. 245-14 at ¶ 7 (Defendant Hinkley stating the same); Dkt. No. 245-16 at ¶ 6 (Defendant Layton stating the same); Dkt. No. 245-21 at ¶ 6 (Defendant Taggart stating the same); Dkt. No. 245-22 at ¶ 6 (Defendant Tuthill stating the same); Dkt. No. 245-24 at ¶ 6 (Defendant Wilson stating the same); Dkt. No. 245-4 at ¶ 7 (Defendant Scott stating that she had "general knowledge of others' personal frustrations with The Reporter");

11

Dkt. No. 245-15 at ¶ 7 (Defendant Kosier stating the same); Dkt. No. 245-6 at ¶ 6 (Defendant Cetta stating that he was "aware of general shared concerns regarding The Reporter's reporting"); Dkt. No. 245-23 at ¶ 5 (Defendant Vernold stating the same); *see also* Dkt. No. 245-7 at ¶ 5 (Defendant Eisel referencing "concerns of non-factual reporting").

Despite this awareness, each Moving Supervisor nonetheless declares his or her "recollection" that issues regarding "non-factual reporting were not raised in the Board meetings I attended where the de-designation was discussed." Dkt. No. 245-3 at ¶ 5 (Defendant Axtell); Dkt. No. 245-4 at ¶ 5 (Defendant Scott); Dkt. No. 245-5 at ¶ 6 (Defendant Davis); Dkt. No. 245-7 at ¶ 5 (Defendant Eisel); Dkt. No. 245-8 at ¶ 6 (Defendant Ellis); Dkt. No. 245-13 at ¶ 6 (Defendant Haynes, Jr.); Dkt. No. 245-14 at ¶ 8 (Defendant Hinkley); Dkt. No. 245-15 at ¶ 5 (Defendant Kosier); Dkt. No. 245-16 at ¶ 6 (Defendant Layton); Dkt. No. 245-21 at ¶ 6 (Defendant Taggart); Dkt. No. 245-22 at ¶ 6 (Defendant Tuthill); Dkt. No. 245-24 at ¶ 6 (Defendant Wilson); *see also* Dkt. No. 245-6 at ¶ 7 (Defendant Cetta stating that, to his "recollection, concerns with The Reporter's reporting were not raised in the Board meetings I attended in 2022 where the de-designation was discussed); No. 245-23 at ¶ 5 (Defendant Vernold stating that, to his "recollection, concerns with The Reporter's reporting were not raised in the Board meetings I attended in 2022 where the de-designation and designation of The Hancock Herald were discussed"). However, none of the Moving Supervisors deny that issues concerning the content of *The Reporter*'s reporting were discussed during the executive session meeting held immediately prior to the Board meeting on March 23, 2022 at which they and other Board members voted to de-designate *The Reporter*. Dkt. No. 255-1 at ¶ 78.

With respect to the March 8, 2023 letter, twelve Moving Supervisors were completely uninvolved in the drafting of the letter (Defendants Axtell, Cetta, Davis, Ellis, Haynes, Jr.,

12

Hinkley, Kosier, Layton, Taggart, Tuthill, Vernold, and Wilson) and the remaining two Moving Supervisors did not sign the letter (Defendants Eisel and Scott). Dkt. No. 252-1 at ¶¶ 38-39. As quoted above, the letter states, *inter alia*, that "the manner in which your paper reports county business was one of the reasons the Board of Supervisors opted to change the official county paper to the Hancock Herald in 2022. This action alone should have signaled to you a problem in the operations of your business and prompted an immediate change." Dkt. No. 246-32 at 7; *see also* Dkt. No. 1 at ¶ 57.

Finally, in her role as County Attorney, Defendant Merklen reports to the Board. Dkt. No. 252-1 at ¶ 43. She did not vote for de-designation, as she is not a member of the Board. *Id.* at ¶ 34. Defendant Merklen oversees all County-related litigation, advises the Board, and provides counsel as it may pertain to legal, compliance, or statutory guidance. *Id.* at ¶ 41. It has been Defendant Merklen's practice, during the entirety of her tenure as County Attorney, to advise the Board and other County employees to not respond to public questions or give public comments on issues which may pertain to potential, current, or sometimes even past, litigation matters. *Id.* at ¶ 44. Beyond the staff in the County Attorney's office, Defendant Merklen lacks any authority to mandate either County employees or elected officials to undertake or avoid any actions, and cannot punish County employees for failing to follow her advice. *Id.* at ¶ 42.

On March 22, 2023, the County received a FOIL request from Plaintiff's counsel, alleging that the March 2022 de-designation and March 2023 letter were retaliatory and a violation of Plaintiff's First Amendment rights. *Id.* at ¶ 45. The FOIL request included a reservation of rights. *Id.* at ¶ 46. Based on this request, Defendant Merklen believed that the County would likely be the subject of litigation by *The Reporter* and/or Plaintiff. *Id.* at ¶ 47. Approximately two months later, on May 18, 2023, Defendant Merklen advised the Board not to talk to any reporters or

comment on issues related to the anticipated litigation.  *Id.* at ¶¶ 52-53.  Approximately seven months after that, on December 4, 2023, Plaintiff commenced this lawsuit.  Dkt. No. 1.

### D.  Additional Facts Relevant to Plaintiff's Motion

In the fall of 2019, one of the owners of *The Reporter* met with Defendant Molé regarding editor Lillian Browne's purportedly "negative bias[ed], nonfactual articles" in *The Reporter*.  Dkt. No. 253-1 at ¶ 11 (alteration in original).  Defendant Molé has testified that her concerns remained unresolved during the next three years.  *Id.*

On November 20, 2021, Defendant Cetta texted Defendant Molé that "[w]e may not use the reporter as our official paper."  *Id.* at ¶ 12 (alteration in original).  Defendant Molé responded that she was "already looking into that."  *Id.* at ¶ 13.

In February 2022, *The Reporter* announced that it was switching over to a statewide automated system for placing legal notices.  *Id.* at ¶ 14.  On March 2, 2022, *The Reporter* completed the switch and learned that it had been undercharging for notices for decades.  *Id.* According to a declaration submitted by Mr. Shepard, *The Reporter* "corrected its publication rates to conform with the rates on the portal, which are prescribed by CPLR 8007."[6]  *Id.* at ¶ 15.

---

[6] "Except where otherwise prescribed by law, the proprietor of a newspaper is entitled for publishing a summons, notice, order or other advertisement, required to be published by law or by the order of any court, or of the clerk of a court, to twenty-nine cents per line of a column width not less than ten pica ems, provided that in computing such charge per line the line shall average at least five words for each insertion in newspapers having a circulation of less than two thousand five hundred; twenty-nine and one-half cents per line for newspapers having two thousand five hundred or more circulation and less than five thousand; thirty and one-half cents per line for newspapers having five thousand or more circulation and less than seven thousand five hundred; thirty-one and one-half cents per line for newspapers having seven thousand five hundred or more circulation and less than ten thousand; thirty-two and one-half cents per line for newspapers having ten thousand or more circulation and less than fifteen thousand; and three and one-half cents per line, in addition to the thirty-two and one-half cents for the initial fifteen thousand circulation, for each additional five thousand circulation up to thirty-five thousand circulation and one and one-half cents per line for each additional five thousand possessed by a newspaper.  To all of the above rates nine cents per line shall be added to the initial insertion charge of each separate advertisement.

Defendants dispute this because, "[u]pon information and belief, the record does not contain reference to what had been historically charged or what the new rates would be." *Id.*; *but see id.* at ¶ 10 (cost of publishing legal notices during 2020 and 2021); Dkt. No. 246-34 at 2 (memo prepared by Defendant Merklen referencing historical and revised rates).

Prior to the de-designation on March 23, 2022, Defendant Molé texted Defendant Merklen that "Lillian [Browne] is already up to 2 more negative articles involving, me, Craig and Joe." Dkt. No. 253-1 at ¶ 16. Defendant Merklen responded that "Christa and I put our heads together and looked into the Hancock Herald. They are a weekly paper with subscribers throughout Delaware [ ] county and newsstands in the Hancock/Deposit area. They have approximately 800 subscribers. They also service northern PA." *Id.* at ¶ 17. As noted earlier, circulation of *The Reporter* has always been larger than that of *The Hancock Herald*. *Id.* at ¶ 35. In 2025, *The Reporter* had a print circulation of 3,507, plus 680 digital subscribers. *Id.* at ¶ 2.

On the evening of March 15, 2022, following the letter to *The Reporter* and the paper's correction that same day, Defendant Molé texted Defendant Merklen: "That's it?" in reference to the correction. *Id.* at ¶ 24; Dkt. No. 246-22 at 3. The next day, on March 16, 2022, Defendant Molé texted Defendant Merklen: "I want to switch official papers." Dkt. No. 253-1 at ¶ 25. Defendant Merklen subsequently sent a draft memo to Defendant Molé regarding "Newspaper Designation." *Id.* at ¶ 27. On March 17, 2022, as noted above, Defendant Molé emailed the memo

---

To all of the above rates for the initial insertion eight cents per line shall also be added for tabular matter or intricate composition. In reckoning line charges allowance shall be made for date lines, paragraph endings, titles, signatures and similar short lines as full lines where the same are set to conform to the usual rules of composition. Display advertising shall be charged agate measurement (fourteen lines to each inch), ten to thirteen pica ems wide, depending on the makeup of the newspaper publishing such copy. . . . Every newspaper making claim for compensation under the provisions of this section must be established at least one year and entered in the post office as second class matter." N.Y. C.P.L.R. § 8007.

to the Moving Supervisors and Defendant Merklen and "request[ed] that the County switch to the Hancock Herald as the Republican's choice for newspaper." *Id.* at ¶ 29; *see also* Dkt. No. 246-26 at 2; Dkt. No. 255-1 at ¶ 64.

On March 24, 2022, following the de-designation of *The Reporter* the day before, Ms. Shepard emailed Defendant Molé and asked if they could meet to discuss the de-designation. Dkt. No. 253-1 at ¶ 37. Defendant Molé responded that the decision was because of "[t]he dramatic increase in price and the County having to do the work and Lillian" and that there was "[n]o need to meet. You and I have met and I had the same concerns then." Dkt. No. 246-29 at 2; *see also* Dkt. No. 253-1 at ¶¶ 38-39.

In January 2023, the Board again voted to designate *The Hancock Herald* an official paper and not *The Reporter*. Dkt. No. 253-1 at ¶ 40.

On February 22, 2023, Defendant Molé emailed the County's public information officer:

> Do you have time to put together a very strong letter to Kim and Randy Shepherd regarding our discussion yesterday. I want to include numerous reporters have told us that Lillian Brown[e] edits their articles and have lost reporters due to this [sic]. Penny will take care of getting all the Department Heads. Thank you.

Dkt. No. 246-30 at 2; *see also* Dkt. No. 253-1 at ¶ 41.

On March 6, 2023, the County's public information officer forwarded for review by Defendants Molé and Merklen "a draft letter for all of the department heads to sign regarding the Reporter." Dkt. No. 253-1 at ¶ 42. The draft letter stated, *inter alia*, that the "flagrant manipulation of facts and the manner in which your paper reports official county business led to the Board of supervisors changing the official county paper to the Herald Hancock in 2022." *Id.* at ¶ 43.

On March 8, 2023, a finalized version of the letter signed by more than three dozen County officials was sent to Plaintiff's owners. *Id.* at ¶ 44. This final version stated, *inter alia*, that the "flagrant manipulation of facts and the manner in which your paper reports county business was

16

one of the reasons the Board of Supervisors opted to change the official county paper to the Hancock Herald in 2022." *Id.* at ¶ 46.

### E. Plaintiff's Claims

Plaintiff's remaining claims[7] under Section 1983 are for alleged violations of the First Amendment based on (i) the County and Defendant Board Members retaliating against Plaintiff in connection with the 2022 de-designation and 2023 communications directive; and (ii) the County and Defendant Merklen impermissibly restraining Plaintiff's right to receive information through the 2023 communications directive. *See generally* Dkt. No. 1 at ¶¶ 102-13; *Decker Advert.*, 765 F. Supp. 3d at 141-57, 148 n.7. Plaintiff seeks, *inter alia*, damages as well as injunctive and declaratory relief. Dkt. No. 1 at 22-23.

## III. STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be

---

[7] On February 24, 2025, the Court partially granted Defendants' motion for judgment on the pleadings and dismissed Plaintiff's Fourteenth Amendment claim, as well as Plaintiff's official capacity claims against the individual Defendants. *Decker Advert.*, 765 F. Supp. 3d at 155, 157; *see also Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 138 (2d Cir. 2025) ("[A] Section 1983 claim for damages against a state official can only be asserted against that official in his or her *individual* capacity.") (alteration in original) (citation omitted).

tried.'"  *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

A party, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002).  A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997).  The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.    DISCUSSION

### A. Defendants' Partial Motion for Summary Judgment

Defendants' Motion argues that summary judgment is warranted for (i) the fourteen Moving Supervisors, with respect to Plaintiff's First Amendment retaliation claim in connection with the 2022 de-designation, as well as any claims against them for punitive damages; (ii) the County and Defendant Merklen, with respect to Plaintiff's First Amendment retaliation claim in connection with the 2023 communications directive; and (iii) the County and Defendant Merklen, with respect to Plaintiff's First Amendment prior restraint claim in connection with the 2023

communications directive.  *See, e.g.,* Dkt. No. 245-2 at 5.  The Court addresses each portion of the Motion below.

### i.  First Amendment Retaliation Claims

Familiarity with the Court's prior discussion of the law applicable to these claims is presumed.  *See generally Decker Advert.*, 765 F. Supp. 3d at 141-51.

### a.  De-Designation

As relevant for purposes of Defendants' Motion, "[t]o state a First Amendment retaliation claim, a plaintiff must plausibly allege that: '(1) [her] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [her]; and (3) there was a causal connection between [the] adverse action and the protected speech.'"  *Long v. Byrne*, 146 F.4th 282, 291 (2d Cir. 2025) (alterations in original) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).  Further, "'[a] plaintiff can prove First Amendment retaliation even if measures taken by the state were otherwise justified.  Plaintiff 'need only establish that the protected activity was a substantial or motivating factor for the adverse employment action[,]' not that it was the only factor."  *Decker Advert.*, 765 F. Supp. 3d at 148 (second alteration in original) (first quoting *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006); and then quoting *Dillon v. Suffolk Cnty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 215 (E.D.N.Y. 2013)).

Defendants' Motion does not challenge Plaintiff's allegations that *The Reporter*'s coverage of the County constituted protected speech and that the County's de-designation of *The Reporter* constituted adverse action.  Dkt. No. 245-2 at 10 ("For the purposes of this motion only, defendants will not contest that Plaintiff engaged in protected speech and suffered an adverse action."); Dkt. No. 252 at 11-12.  Instead, Defendants' Motion contends only that summary judgment is

19

appropriate because the record cannot support finding as a matter of law a causal connection between the coverage and the de-designation, at least for the fourteen Moving Supervisors. Dkt. No. 245-2 at 10-14; Dkt. No. 255 at 4.

The Court denies this portion of the Motion. In short, the disputed factual record precludes summary judgment as to Plaintiff's First Amendment retaliation claim based on the de-designation of *The Reporter*. Defendants acknowledge this disputed record in their opposition to Plaintiff's competing motion for summary judgment. *See, e.g.,* Dkt. No. 253 at 4 ("Summary judgment is inappropriate at this stage as there are material issues of fact as to whether the Board's vote to de-designate was motivated by an illegal reason – as opposed to the very legal reasons of increased cost and burden."). To the extent that this concession does not defeat Defendants' own Motion, the Court proceeds to address Defendants' arguments in favor of summary judgment.

Defendants' core argument is that because eleven of the fourteen Moving Supervisors were never deposed, their declarations in support of the Motion constitute the sum total of "admissible proof as to the motivation behind their vote to de-designate *The Reporter*[,]" Dkt. No. 255 at 4, and thus "the record conclusively demonstrates that the motivation for voting to de-designate was to avoid the increased costs for placing legal ads and the increased burden the new ad placement system imposed on County employees[,]" Dkt. No. 245-2 at 12. Both prongs of this argument fail.

First, the declarations from the Moving Supervisors are hardly the only evidence in the current record regarding their motivation(s). Foremost, twelve of the Moving Supervisors who voted for de-designation subsequently signed a letter stating, *inter alia*, that "[i]t appears to the signatories of this letter your paper has become a platform to undermine the County and the work that we do each and every day" and that "the manner in which your paper reports county business was one of the reasons the Board of Supervisors opted to change the official county paper to the

20

Hancock Herald in 2022. This action alone should have signaled to you a problem in the operations of your business and prompted an immediate change." Dkt. No. 246-32 at 7; *see also* Dkt. No. 1 at ¶ 57. As Defendants "recognize, for purposes of this motion only, the Court has opined that the March 8 Letter may be evidence of retaliatory motive." Dkt. No. 245-2 at 12 (citation omitted). Indeed, the letter does not identify cost or burden as reasons for the Board's prior action. Dkt. No. 246-32 at 7-8. Further, while it is presently undisputed that these twelve Moving Supervisors were uninvolved with drafting the letter, they nonetheless signed it. Dkt. No. 246-32 at 8-9; Dkt. No. 1 at ¶ 58. A reasonable jury could conclude that each of these Moving Supervisors did so— seemingly without requesting any revisions—because they thought the statements in the letter to be true.[8]

Beyond this letter, communications and testimony in the record provide additional evidence that at least one of the motivations of the Moving Supervisors for the de-designation of *The Reporter* was its reporting of the County. For example, the letter the County's attorney sent *The Reporter* on March 15, 2022 complained about the paper's coverage of the County and did not mention cost or burden. Dkt. No. 246-33 at 3-4; *see also* Dkt. No. 1 at ¶ 35. Defendant Molé also emailed the Moving Supervisors two days later, on March 17, 2022, "requesting that the County switch to the Hancock Herald as the Republican's choice for newspaper" because *The Reporter* "continues to disparage and write non-factual articles about the County" and "the County deserves better than what the Reporter gives us." Dkt. No. 246-26 at 2; *see also* Dkt. No. 255-1 at ¶¶ 64, 69. Although Defendant Molé's email and the attached memo identified concerns about

---

[8] A reasonable jury could, of course, reach a variety of different conclusions, including the one Defendants argue in their opposition to Plaintiff's Motion. Dkt. No. 253 at 10 ("Taking all these facts in a light most favorable to Defendants, a reasonable jury could find that merely signing on to a letter in solidarity is not evidence of malice or retaliatory intent."). On the current record, such determinations are for a jury to make at trial, not the Court to make at summary judgment.

21

cost, as well, a reasonable juror could conclude that the primary focus was concerns about *The Reporter*'s coverage of the County. Additionally, numerous Moving Supervisors responded to Defendant Molé's email and indicated that they agreed with switching newspapers. Dkt. No. 255-1 at ¶ 65. A reasonable juror could conclude that they did so because they shared Defendant Molé's view of *The Reporter*'s coverage of the County, and could also conclude that all fourteen Moving Supervisors voted in favor of de-designating *The Reporter* the following week for the same reason. Members of the Board have also testified that the de-designation was motivated, at least in part, by concerns regarding *The Reporter*'s coverage. Dkt. No. 255-1 at ¶¶ 70-71, 73. Finally, because there is no evidence in the record that any Defendant reached out to Plaintiff regarding cost or burden concerns prior to de-designation, a reasonable juror could conclude that these were not actually the motivations for the seventeen Defendant Board Members who voted for de-designation. *Id.* at ¶ 79.

As for the declarations submitted by the fourteen Moving Supervisors, the Court agrees with Plaintiff that these raise more questions than they answer. *See, e.g., id.* The Moving Supervisors do not deny that *The Reporter*'s coverage was discussed during Board meetings. Instead, they share their "recollection" that this topic was "not raised in the Board meetings I attended where the de-designation was discussed[.]" *See supra* Section II.C. A reasonable juror could conclude that this topic was raised in Board meetings prior to the March 2022 meeting at which the Board voted to de-designate *The Reporter*.

The declarations also fail to address what the Moving Supervisors may have discussed outside the Board meetings in which de-designation was raised. *See, e.g.,* Dkt. No. 245-4 at ¶ 5 (Defendant Scott stating that, to her "recollection, concerns with The Reporter's reporting were not raised in the Board meetings I attended in 2022 where the de-designation was discussed");

Dkt. No. 245-5 at ¶ 6 (Defendant Davis stating that, to his "recollection, these issues regarding non-factual reporting were not raised in the Board meetings I attended where the de-designation was discussed"); No. 245-6 at ¶ 7 (Defendant Cetta stating that, to his "recollection, concerns with The Reporter's reporting were not raised in the Board meetings I attended in 2022 where the de-designation was discussed").  Indeed, every Moving Supervisor indicates that they were generally aware of concerns about *The Reporter*'s coverage, including concerns by other unidentified Supervisors.  *See supra* Section II.C.  A reasonable jury could conclude that this topic was the subject of extensive discussion among the Defendant Board Members, and ultimately resulted in all fourteen Moving Supervisors joining three other Defendant Board Members in voting for de-designation.  For instance, and as Plaintiff notes, the Moving Supervisors do not deny that the Board discussed *The Reporter*'s coverage at the executive session meeting immediately prior to the Board meeting at which that vote occurred.[9]  In any event, at least one other Defendant Board Member has testified that the Board discussed *The Reporter*'s reporting during this executive session meeting.  Dkt. No. 255-1 at ¶ 74.

The Motion's remaining arguments as to why the Moving Supervisors are entitled to summary judgment on Plaintiff's First Amendment retaliation claim regarding the de-designation are similarly unpersuasive.

First, Defendants argue that because New York County Law § 214(1) purportedly permitted the Board "to consider The Reporter's political viewpoints when selecting an official

---

[9] The Court does not credit Defendants' suggestion that this meeting is "immaterial" simply because the Moving Supervisors' "[d]eclarations do not refer to the Executive Session meeting immediately prior to the vote." Dkt. No. 255-1 at ¶ 78. Defendant Molé's March 17, 2022 email regarding *The Reporter*'s designation states that "[i]f you agree, I will have an executive session to discuss with the full Board before we introduce a resolution." Dkt. No. 246-26 at 2; *see also* Dkt. No. 255-1 at ¶ 64.

paper, Plaintiff cannot make out the necessary causal connection[.]" Dkt. No. 245-2 at 11-12. The Court need not reach Defendants' interpretation of the statute because, even if it is correct, the Moving Supervisors do not contend that they de-designated *The Reporter* based on its political viewpoints, as Plaintiff notes. Dkt. No. 252 at 12. Indeed, Defendants' position is that:

> [T]he record conclusively demonstrates that the motivation for voting to de-designate was to avoid the increased costs for placing legal ads and the increased burden the new ad placement system imposed on County employees. . . . The Moving Supervisors each aver that cost and effort were the only reasons for their vote, and the record is devoid of any evidence to raise a question of material fact on that issue. There is no record evidence that the Moving Supervisors did anything but vote to change papers based on what they believed to be a legally permissible reason.

Dkt. No. 245-2 at 12 (citations omitted); *see also* Dkt. No. 255 at 7 ("There is no evidence that the Moving Supervisors, who represent the vast majority of the Board, had any personal concerns over the reporting."). Because none of the Moving Supervisors contend that their decision was based on *The Reporter*'s political viewpoints, this factually unsupported argument cannot serve as a basis for summary judgment.

Second, Defendants argue that they are entitled to summary judgment based on a *Mount Healthy* defense. Dkt. No. 245-2 at 13-14; *see also Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). "A *Mount Healthy* defense—that a defendant would have taken the same adverse action in the absence of the protected speech—is highly fact-intensive." *Decker Advert.*, 765 F. Supp. 3d at 148 (quoting *Severin v. N.Y.C. Dep't of Educ.*, No. 19-cv-00775, 2021 WL 122695, at *8 (S.D.N.Y. Mar. 31, 2021)). As the Court previously observed, "even at the summary judgment stage, that Defendants can point to other reasons for the de-designation decision does not automatically shield them from liability." *Id.* Given the disputed factual record detailed above, the Court finds it inappropriate to grant summary judgment based on this defense. *See, e.g., Thomas v. Arteta*, No. 23-cv-2981, 2025 WL 2709977, at *7 (S.D.N.Y. Sept. 22, 2025)

24

("A *Mt. Healthy* defense presents a high bar at summary judgment.").

### b.  Communications Directive

As to the First Amendment retaliation claim based on the 2023 communications directive, Defendants' Motion asserts that summary judgment is warranted on the required elements of causal connection and injury.  Dkt. No. 245-2 at 14-15.  Plaintiff responds that the current record readily demonstrates these elements.  Dkt. No. 252 at 25.  For the reasons that follow, the Court finds that summary judgment is not warranted on this claim.

Defendants reduce the record on this claim to the issue of whether "Ms. Merklen's advice to County employees to refrain from press communications following the publication of the New York Times article was imposed in retaliation for [*The Reporter*'s] protected speech" and proceed to argue that "there is no evidence in the record to find a causal connection between the issuance of the advice and The Reporter's participation in the New York Times story."  Dkt. No. 245-2 at 14-15.  This framing ignores most of the factual record before the Court.  As detailed above, *The New York Times* article was published on June 18, 2023.  Dkt. No. 252-1 at ¶ 55.  It is undisputed that the County became aware in May 2023 that *The New York Times* was preparing an article regarding the March 2022 de-designation.  *Id.* at ¶ 50.  The Court has detailed the numerous communications from Defendants that month regarding limitations on communications with *The Reporter*.  *See, e.g., id.* at ¶ 85 (May 15, 2023 email from Defendant Merklen to Defendant Molé, following an inquiry from *The Reporter*, stating that "[a]s a rule, individual departments should not be sending emails/responses to the press, just like FOIL requests"); *id.* at ¶ 86 (May 16, 2023 email from Defendant Merklen to Defendant Molé and the County's personnel director, following another inquiry from *The Reporter*, stating that "Department heads need to stop having conversations with Lillian"); Dkt. No. 252-14 at 2 (May 17, 2023 email from Defendant Molé to

25

the Clerk of the Board, requesting that she "kindly send an email to all Department Heads that they should not be responding to any press inquiries . . . The requests should go to [Defendant Merklen] and . . . our Public Information Officer") (first alteration in original); Dkt. No. 252-1 at ¶ 51 (May 17, 2023 email from the Clerk of the Board to the County department heads stating "a reminder to please not respond to any press inquiry. Those requests should be directed to [Defendant Merklen] or to . . . our Public Information Officer"). After publication of *The New York Times* article, there are still more communications. *See, e.g.,* Dkt. No. 252-9 at 2 (June 23, 2023 email from County department head stating that "I have been directed to refer all inquiries in this matter and any other matter that pertains to the Public Defender's office to the County Attorney's office. Thank You"). And, as Plaintiff notes, there is also testimony in the record that County employees interpreted the directive's language as a blanket prohibition on speech. Dkt. No. 252 at 26-27.

As for Defendants' argument "that the sole motivation for Ms. Merklen issuing any directive was to protect against litigation risk[,]" Dkt. No. 245-2 at 15, a jury may well reach that conclusion and agree with Defendants that "[t]his real threat of litigation is a reasonable explanation for the directive[,]" Dkt. No. 255. But it is certainly not the only conclusion a reasonable jury could reach. Indeed, the current record suggests that although Defendant Merklen became aware of this litigation risk as a result of the March 22, 2023 FOIL request from Plaintiff's counsel, Defendant Merklen did not inform the Board of this litigation risk until May 18, 2023. Dkt. No. 252-1 at ¶¶ 45, 52. A reasonable juror could infer that it was actually Defendants' awareness in May 2023 of the forthcoming *The New York Times* article that resulted in the flurry of communications referenced above and the imposition of the communications directive, and not the FOIL request almost two months prior.

In short, the Court finds that there is sufficient evidence of causal connection to defeat

26

summary judgment. *See* Dkt. No. 252 at 28 ("As the series of emails in May and June 2023 regarding the issuance of the gag directive show, a causal connection plainly exists between Ms. Browne asking questions that County officials did not like and the issuance of a gag directive specifically to 'stop' employees from 'having conversations with [*The Reporter*'s Editor,] Lillian [Browne].'") (alterations in original) (citation omitted).

The Court also finds that Defendants' arguments regarding injury fail at this stage. A reasonable jury could conclude, for example, that various County department heads responded to the directive by changing their interactions with the press and/or seeking clarification regarding the directive, Dkt. No. 255-1 at ¶¶ 88-90, and that this injured *The Reporter*'s "First Amendment newsgathering activity" and "chilled its speech[,]" *Decker Advert.*, 765 F. Supp. 3d at 151 (citing *McKenna v. Nassau Cnty.*, No. 23-cv-4286, 2023 WL 8455670, at *11 (E.D.N.Y. Dec. 6, 2023)); *see also In re Dow Jones & Co., Inc.*, 842 F.2d 603, 607 (2d Cir. 1988) ("[T]he First Amendment unwaveringly protects the right to receive information and ideas.").

For all of these reasons, Defendants' Motion with respect to Plaintiff's First Amendment retaliation claims is denied.

### ii. Punitive Damages

Defendants argue that Plaintiff's claim for punitive damages should be dismissed against the Moving Supervisors because the record does not support an inference of "malice" or "conscious wrongdoing." Dkt. No. 245-2 at 20-21. Plaintiff argues that the current record could support the award of punitive damages, Dkt. No. 252 at 29-31, and Defendants offer no opposition to these arguments in their reply, *see generally* Dkt. No. 255. To the extent that Defendants have not abandoned this argument, *see, e.g., Doe v. Indyke*, 465 F. Supp. 3d 452, 466 (S.D.N.Y. 2020) ("Defendants do not respond to this [contrary] argument in reply, and the Court deems them to

27

have abandoned the[ir original] argument.") (collecting cases), the Court agrees with Plaintiff in light of the record detailed above. *See, e.g., supra* Section IV.A.i.a; *see also Cameron v. City of New York*, 598 F.3d 50, 69 (2d Cir. 2010) (stating that punitive damages are appropriate for a jury "when the plaintiffs have produced evidence that 'the defendant's conduct is . . . motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others,' or, in other words, when the plaintiffs have produced evidence of 'a positive element of conscious wrongdoing' or 'malice.'") (alterations in original) (citation omitted). Accordingly, the Court denies this portion of Defendants' Motion.

### iii. Prior Restraint

Familiarity with the Court's prior discussion of the law applicable to this claim is also presumed. *See generally Decker Advert.*, 765 F. Supp. 3d at 151-55.

Defendants first argue that the speech at issue is not protected by the First Amendment, because there is no evidence that any County official spoke as a private citizen. Dkt. No. 245-2 at 17-18. Plaintiff's primary opposition is that Defendants' cursory argument fails to address the relevant law and does not establish that any County official's speech was pursuant to their job responsibilities, as opposed to merely regarding those responsibilities. Dkt. No. 252 at 19-21.

"It is not the case that all speech that is related to an employee's duties is exempt from First Amendment protection." *Long*, 146 F.4th at 295. "Although speech pursuant to a public employee's work duties does not implicate the First Amendment, 'the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech.'" *Id.* (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). Instead, the "critical question" "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573

28

U.S. at 240.  Courts "ask two questions to determine whether a public employee speaks as a citizen: (A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?"  *Matthews v. City of New York*, 779 F.3d 167, 173 (2d Cir. 2015) (citing *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203-04 (2d Cir. 2010)). Defendants' cursory argument on the first point is unpersuasive for the reasons set forth by Plaintiff.  Dkt. No. 252 at 19-21; *see also Decker Advert.*, 765 F. Supp. 3d at 153-54; *Matthews*, 779 F.3d at 175 (stating that the Supreme Court has "explicitly 'reject[ed] . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions'") (second alteration in original) (citation omitted).  Defendants offer no argument on the second point.  *See generally* Dkt. No. 245-2 at 17-20; Dkt. No. 255 at 12-14.  As a result, Defendants have failed to demonstrate that they are entitled to summary judgment on this issue.

Defendants next argue that the record does not demonstrate a willing speaker.  Dkt. No. 245-2 at 18-20; *see also Decker Advert.*, 765 F. Supp. 3d at 152 ("An organization's right to receive information is impaired when it is unable to hear from a speaker who is willing to speak, but who has been obstructed by government action.") (quoting *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 323 (S.D.N.Y. 2020)).  This argument again appears undercut by Defendants' subsequent position that "[t]he Record reflects that, notwithstanding any cautionary advice by the County Attorney regarding the potential for litigation, County employees regularly spoke with *The Reporter*."  Dkt. No. 255 at 12.  Plaintiff also points to other evidence in the record.  Dkt. No. 252 at 22-25.  In sum, the Court agrees that a reasonable juror could conclude that there is evidence of a willing speaker, and denies this portion of Defendants' Motion.

### B.  Plaintiff's Partial Motion for Summary Judgment

Plaintiff seeks summary judgment against all Defendants on its First Amendment

29

retaliation claim in connection with the de-designation.  Dkt. No. 246.

The Court has carefully considered the parties' submissions and arguments on this issue, *see, e.g.,* Dkt. No. 246, 253, 254, but finds that addressing them in detail is unnecessary given the factual record and the preceding discussion.  In short, the factual record precludes summary judgment on this claim.

It is undisputed that, for years, the Board continued to re-designate *The Reporter*, despite concerns over the paper's reporting.  *See, e.g.,* Dkt. No. 253 at 5; Dkt. No. 252-1 at ¶ 24.  Plaintiff's Motion relies heavily on the March 2023 letter as proof that various Defendants retaliated against Plaintiff a year earlier as a result of its reporting.  *See, e.g.,* Dkt. No. 246-2 at 13.  A jury may well agree.  But that factual conclusion is not inescapable, and thus it is not appropriate for the Court to enter judgment as a matter of law at this stage.  *See, e.g.,* Dkt. No. 253 at 10 ("Taking all these facts in a light most favorable to Defendants, a reasonable jury could find that merely signing on to a letter in solidarity is not evidence of malice or retaliatory intent.").  Numerous Defendants were not involved in preparing the letter; others did not sign it; and the letter was revised to indicate that there were multiple reasons for the de-designation.  *See supra* Sections II.D & IV.A.i.a.

Moreover, *The Reporter* did, apparently, double the cost it charged the County for legal notices and switched to a more onerous system soon after its designation in January 2022.  *See supra* Section II.D.  Defendants contend that such concerns motivated the de-designation in March 2022, and there is contemporaneous correspondence to that effect, as well as testimony from numerous Defendants and the Board's resolution itself.  If a jury were to credit such evidence, it could also conclude that Defendants (or some portion of them) would have voted for de-designation as a result of these concerns regardless of *The Reporter*'s coverage of the County. *Anemone v Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011) ("We have noted that 'although

the language in *Mt. Healthy* refers to the plaintiff's *conduct,* the [Supreme] Court's analysis, properly understood, attempts to weigh the impact of the defendant's *impermissible reason* on the defendant's decision to act,' such that a defendant can 'avoid liability by showing that it would have taken the same action in the absence of the impermissible reason.'") (alteration in original) (citation omitted).

Because the current record does not permit summary judgment on this claim, the Court denies Plaintiff's motion.

## V.      CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' partial motion for summary judgment, Dkt. No. 245, is **DENIED**; and the Court further

**ORDERS** that Plaintiff's partial motion for summary judgment, Dkt. No. 246, is **DENIED**;

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 21, 2026
        Albany, New York

Anne M. Nardacci
U.S. District Judge

31